# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

WATER QUALITY INSURANCE
SYNDICATE,

               Plaintiff,

               v.

UNITED STATES OF AMERICA,

               Defendant.

Civil Action No. 15-789 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

The plaintiff Water Quality Insurance Syndicate ("WQIS") brings this action against the defendant United States of America challenging a decision by the National Pollution Funds Center ("NPFC") of the United States Coast Guard ("USCG"), under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551, *et seq.* The challenged NPFC decision, issued on June 30, 2014, pursuant to the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701, *et seq.*, denied plaintiff's claim for reimbursement of the costs for cleaning up an oil spill in Cook Inlet, Alaska, that resulted from a supply vessel, the MONARCH, colliding with an offshore oil and gas production platform. *See* Administrative Record ("AR") US003494 (Letter from NPFC Claims Manager to plaintiff (June 30, 2014) ("First Denial Decision")).[1] The NPFC's denial decision

---

[1] The complete AR, consisting of over four thousand pages, has been submitted in response to this Court's order. *See* Minute Order, October 10, 2016. The defendant initially filed a certified index of the contents of the AR, as required by this Court's Local Rule 7(n), on September 3, 2015, s*ee* Index to the AR, ECF No. 11, and a revised index on November 3, 2015, *see* Index to OSV Monarch AR, Revised 22 October 2015, ECF No. 13. The documents comprising the parties' Joint Appendix is docketed in 16 separate entries on the Case Management/Electronic Case Filing ("CM/ECF") system, ECF Nos. 27-1–16. For ease of reference, throughout this Memorandum Opinion, citations to the AR provide the bates-stamped page and the title of the document, unless the cited document is otherwise clear from the text.

turned on a finding that the oil discharge was proximately caused by the MONARCH Captain's

gross negligence, which is a statutory ground for denial of reimbursement.[2]  *Id.*

 Pending before the Court are the parties' cross-motions for summary judgment.  *See* Pl.'s

Mot. Summ. J. ("Pl.'s Mot."), ECF No. 19; Def.'s Cross-Mot. Summ. J. & Opp'n Pl.'s Mot.

Summ. J. Cross-Mot. ("Def.'s Opp'n"), ECF No. 20.  For the reasons set out below, the

plaintiff's motion is granted in part and denied in part, and the defendant's cross-motion is

denied.[3]

# I. BACKGROUND

 Following review of the applicable statutory framework under the OPA, the relevant

factual and procedural background is summarized below.

## A. STATUTORY FRAMEWORK

 The policy of the United States, as expressly articulated by the Congress, is "that there

should be no discharges of oil . . . into or upon the navigable waters of the United States" or

other waters under federal jurisdiction.  33 U.S.C. § 1321(b)(1).  In the wake of the massive spill

in 1989 of eleven million gallons of oil from supertanker EXXON VALDEZ into the Prince

William Sound in Alaska, Congress determined that then-existing laws provided inadequate

remedies for addressing the damage caused by oil spills and therefore enacted, in 1990, the OPA.

*See Hornbeck Offshore Transp., LLC v. United States*, 569 F.3d 506, 511 (D.C. Cir. 2009);

*Water Quality Ins. Syndicate v. United States*, 522 F. Supp. 2d 220, 226 (D.D.C. 2007); *United*

*States v. Bodenger*, 2003 WL 22228517, at *2 (E.D. La. Sept. 25, 2003); *Apex Oil Co. V. United*

---

[2] On reconsideration of the First Denial Decision, the NPFC again denied the plaintiff's claim.  *See* AR
US003545 (Letter from Chief, NPFC Claims Adjudication Division to WQIS (July 21, 2015) ("Second Denial
Decision")).  As discussed *infra* in Part III.A, the First Denial Decision constitutes the final agency action for
purposes of APA review in this lawsuit.

[3] The plaintiff requested oral argument on the pending motions but, given the sufficiency of the parties'
written submissions and the ample AR, this request is denied.  *See* LCvR 7(f) (stating allowance of oral hearing is
"within the discretion of the Court").

*States*, 208 F. Supp. 2d 642, 651-652 (E.D. La. 2002).  The "OPA was designed 'to streamline federal law so as to provide quick and efficient cleanup of oil spills, compensate victims of such spills, and internalize the costs of spills within the petroleum industry.'"  *Hornbeck Offshore Transp.*, 569 F.3d at 511 (quoting *Rice v. Harken Expl. Co.*, 250 F.3d 264, 266 (5th Cir. 2001)).

To meet these goals, the OPA established a comprehensive system of strict liability for the removal of oil discharges, subject to liability caps and funding support paid for by the oil industry.  Specifically, under the OPA, a "responsible party" for a vessel or a facility that discharges oil into the navigable waters of the United States is strictly "liable for the removal costs and damages . . . that result from such incident."  33 U.S.C. § 2702(a).  The OPA defines a "responsible party" to include vessel owners, operators, and demise charterers.  *See* 33 U.S.C. § 2701(32)(A).

At the same time, the OPA limits liability and removal costs based on vessel type and tonnage.[4]  *See* 33 U.S.C. § 2704(a).  Responsible parties for vessels "from which oil is discharged" are authorized to submit a claim with supporting documentation to the NPFC to recover costs beyond the prescribed limits by demonstrating that the party "is entitled to a limitation of liability under section [33 U.S.C. § 2704]."  33 U.S.C. § 2708(a)(2); *see United States v. Locke*, 529 U.S. 89, 101-02 (2000) (noting that OPA "imposes liability (for both removal costs and damages) on parties responsible  for an oil spill" and "[o]ther provisions provide defenses to, and limitations on, this liability").

---

[4]        The OPA "places the greatest exposure upon" owners of larger vessels, who "are in a better position to insure against an oil spill or to absorb the cost of a spill and pass the cost on to their customers. By placing the greatest risks of operating a vessel in the navigable waters of the United States upon those who receive the greatest benefits from doing so, the statute's liability scheme allows the costs associated with oil spills to be spread among all those who benefit from maritime commerce, including those who consume products which are shipped from overseas." *National Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.*, 924 F. Supp. 1436, 1447 (E.D. Va. 1996).

The OPA created the Oil Spill Liability Trust Fund ("the Fund") to pay such claims "for uncompensated removal costs determined by the President to be consistent with the National Contingency Plan [("NCP")] or uncompensated damages."  33 U.S.C. § 2712(a)(4).  The Fund is financed through a tax on the oil industry, *see* 33 U.S.C. § 2701(11); 26 U.S.C. § 9509, thereby "internaliz[ing] the cost of oil spills within the petroleum industry," *Great Am. Ins. Co. v. United States*, 55 F. Supp. 3d 1053, 1064 (N.D. Ill. 2014).  The NPFC is responsible for adjudicating claims to the Fund and determining whether the uncompensated removal costs are consistent with the NCP.  A claimant "seeking recovery [from the fund] bears the burden of providing all evidence, information, and documentation deemed necessary by the Director[ ] [of the] NPFC, to support the claim.'"  *Smith Prop. Holdings, 4411 Conn. L.L.C. v. United States*, 311 F. Supp. 2d 69, 71 (D.D.C. 2004) (quoting 33 C.F.R. § 136.105) (alterations in original).

The limitation on liability for removal costs is subject to statutory exceptions that remove the liability cap and the concomitant authority for the responsible party to obtain reimbursement from the Fund.  The liability limitation does not apply, for example, when the responsible party fails to report the incident as required or to provide all reasonable cooperation and assistance with removal activities.  *See* 33 U.S.C. § 2708(c)(2)(A) and (B).  In addition, as relevant here, the liability limitation on removal costs does not apply when the incident was "proximately caused by (A) gross negligence or willful misconduct of or, (B) the violation of an applicable Federal safety, construction, or operating regulation by, the responsible party, an agent or employee of the responsible party, or a person acting pursuant to a contractual relationship with the responsible party." 33 U.S.C. § 2704(c)(1).  Thus, "[r]esponsible parties may face unlimited liability for, *inter alia*, acts of gross negligence or willful misconduct." *Puerto Rico v. M/V Emily S. (In re Metlife Capital Corp.)*, 132 F.3d 818, 821 (1st Cir. 1997).

B.      The MONARCH ALLISION AND OIL SPILL[5]

The MONARCH is owned by Ocean Marine Services, Inc. ("OMSI") and covered by an

oil pollution insurance policy issued by plaintiff.  AR US002603 (Letter from OMSI to USCG,

Alaska Department of Natural Resources, and Alaska Department of Environmental

Conservation (Feb. 26, 2010)); US000001-03 (Pl.'s Claim Letter to NPFC) (Jan. 10, 2012)).

This vessel supplies oil and gasoline to offshore production platforms in Cook Inlet and provides

backup oil spill response services.  AR US002632 (Global Diving & Salvage Report &

Recommendations ("GDS Report")).[6]  At the time of the incident, the MONARCH was

seaworthy and suitable for service in the Gulf of Alaska.  AR US002800–02 (Certificate of

Inspection (May 16, 2005, amended Nov. 8, 2010)).

In the winter, Cook Inlet has tidal fluctuations of 20 feet or more, with strong tidal

currents that can reach estimated velocities of two to three knots at the entrance to the Inlet and

increased velocities in particular areas, as well as ice packs that can reach up to 6.5 feet thick.

AR US003764, 4095 (USCG's "Report of Investigation Into the Circumstances Surrounding the

Incident Involving the Sinking of the OSV MONARCH" ("USCG Report") (June 25, 2009)).

Despite these treacherous conditions, oil platforms operate continuously through the winter

months, and "there is great pressure from the platform owners to have these [resupply] vessels

---

[5]      As used in admiralty law, "[a]n allision occurs when a moving vessel strikes a stationary object, and a
collision occurs when two moving vessels strike each other."  *Bessemer & Lake Erie R.R. Co. v. Seaway Marine
Transp.*, 596 F.3d 357, 362 (6th Cir. 2010).  "In modern practice, 'collision' is often used where 'allision' was once
the preferred term."  *Posavina Shipping Co. v. Alex C Corp. (In re Alex C Corp.)*, 2010 WL 4292328, at *1 n.2 (D.
Mass. Nov. 1, 2010) (citing Black's Law Dictionary 88 (9th ed. 2009)).

[6]      Global Diving & Salvage ("GDS") is an expert engaged by OMSI to study the "circumstances surrounding
the casualty of the MONARCH and the alternatives available for the vessel's disposition."  AR US002617 (GDS
Report).  In preparing its report, GDS relied on multiple sources that were "vetted for authenticity and veracity,"
including interviews with the MONARCH crew members, "[h]istorical Cook Inlet ice and tidal current statistics
provided by the [National Oceanic and Atmospheric Administration]," and "[m]ore than 75 years of cumulative
experience of GDS personnel working in and around Cook Inlet and the Granite Point platform."  AR US002620-21.
The report was submitted to the NPFC in response to the NPFC's request for additional information in connection
with the plaintiff's initial claim.  AR US002539-42 (Letter from NPFC Claims Manager to plaintiff's agent (Mar.
27, 2013)) and AR US002545 (Pl.'s Letter to NPFC Claims Manager (Aug. 5, 2013)).

operate regardless of the conditions." AR US003793 (USCG Report);[7] *see also* AR US002627 (GDS Report).

On January 15, 2009, the MONARCH was under the command of Captain Jeremy Bucklin, "very experienced in Cook Inlet operations, having worked himself up from deckhand to mate to master." AR US002627 (GDS Report); *see also* AR US002486 (USCG Interview of Captain Bucklin (Jan. 21, 2009) ("USCG Captain Interview")). Captain Bucklin testified as part of the USCG's investigation that he has been operating in the Cook Inlet for eleven years: five years as a mate and then six years as Captain of the MONARCH. AR US002486 (USCG Captain Interview).

At the time of the incident, the MONARCH had on board seven crew members, including the Captain and Chief Mate Walter Mitchell Hebb III. AR US002471 (USCG Interview of Chief Mate Walter Mitchell Hebb (Jan. 21, 2009) ("USCG Hebb Interview")). After servicing five platforms, with three more to go, the ship set out from the Monopod platform towards its sixth stop, approximately eight nautical miles north, to the Granite Point platform. AR US002466 (USCG Interview of crewmember Russell Tomlinson (Jan. 21, 2009) ("USCG Tomlinson

---

[7]    The USCG Report regarding the MONARCH allision includes certain recommendations, including that "more stringent safety guidelines" applicable to resupply vessels be developed, due to the "dangers" in Cook Inlet, to "provide relief to the supply vessel masters and company owners when pressured to operate in conditions deemed less than safe as well as a formal means of voicing concern to the oil platform operators of the dangers posed to vessels operating in Cook Inlet." AR US003765. Although the USCG has issued guidelines for larger vessels operating in icy conditions in the Gulf of Alaska, no ice guidelines have been issued for vessels, such as the MONARCH, which perform resupply services. *See* AR US003764, 3774 ("Currently several types of vessels must follow ice guidelines when transiting through Cook Inlet to mitigate some of the extreme hazards of operating in Cook Inlet, however, the MONARCH is currently not subject to these guidelines."); *see also* AR US002464 (USCG Interview of crewmember Jack W. Sisson, Jr. (Jan. 21, 2009) ("USCG's Sisson Interview") (opining that a "concerted effort" is required between "Chevron and OMSI operations to stop their drilling projects in the dead of winter when it's the toughest time to get a boat around out there"). The record contains no information about whether the USCG has, in accord with its own recommendation, issued "more stringent" ice guidelines for resupply vessels. Denial of limitation on liability to such vessels operating in treacherous ice conditions may apply pressure of a different sort on "industry partners, and all other interested parties" to "discuss the application of the Ice Operation Guidelines for supply vessels in Cook Inlet," AR US003765, but the NPFC decision to issue such a denial must still withstand scrutiny under the APA.

Interview")).  The Granite Point platform is a fixed production platform, currently owned by

Chevron, and located on the west side of northern Cook Inlet.  AR US003764 (USCG Report);

AR US003827 (USCG Witness Statement)[8]; AR US002635 (GDS Report).  While the platforms

already serviced by the MONARCH were in open water, the Granite Point platform was located

further north where there was a "bigger accumulation of ice."  AR US002452 (USCG Interview

of crewmember William James Kelley (Jan. 21, 2009) ("USCG Kelley Interview").  The

platform is supported by four seventeen-foot diameter legs, which break up ice pans such that

maneuvering around the platform is easier by approaching it against the current.  AR US002635,

2638 (GDS Report).  Given the ice, wind, and tidal current circumstances on January 15, 2009,

the crew planned to head north to Granite Point with the tidal current, pass the platform on the

west side, then make a 180-degree turn toward the south and move against the current toward the

platform.  AR US002627 (GDS Report).

On the morning of the incident, Chief Mate Hebb held the 12:00 a.m. navigational watch,

with each watch scheduled for six hours.  AR US002471–72 (USCG Hebb Interview).  At 5:00

a.m., Captain Bucklin awoke and went to the main cabin to replace Chief Mate Hebb early at

approximately 5:20 a.m.[9]  AR US003764 (USCG Report finding that "[t]he Master of the

MONARCH had awoken at 0500 due to the noise from the breaking ice and subsequently relieved

the Mate at approximately 0515 instead of the scheduled 0600."); AR US002466 (USCG

Tomlinson Interview, stating "[a]t about 5:20, the captain came up with his cup of coffee, you

know, getting ready to go to work the three rigs up north"); AR US003831 (USCG Report,

---

[8]     In the AR provided to the Court, the names of some crewmembers providing supplementary witness
statements have been redacted.
[9]     Subsequent to the incident, the USCG found that the MONARCH's watch schedule of six hours on watch
and six hours on rest "can cause fatigue because the crew usually only receives less than 5 hours actual sleep,"
especially "when the vessel is operating in ice because" this "creates extreme noise and vibrations that can disturb
sleep."  AR US003792 (USCG Report).

Supplemental Statement by Chief Mate Hebb ("Chief Mate Supp. Statement") that "[a]round 5:20 . . . [the Captain] came up top with coffee."); AR US002486 (USCG Captain Interview, stating that he woke up at approximately 5:00 a.m. and "probably arrived at the wheel house at 20 after, 5:30, perhaps. Somewhere in there.  I can't give you more – this is my best guess on times.  It was either 5:20 to 5:30.").

During the hand-off, Chief Mate Hebb reported to Captain Bucklin "about how [his] evening had gone and how much work [he] had done, and . . . told him that [he] had called Granite Point platform."  AR US002474 (USCG Hebb Interview); AR US003831 (Chief Mate Supp. Statement that "Captain and Mate discussed what we had done and what we were going to do next.").  Chief Mate Hebb told Captain Bucklin that the MONARCH was forty-five minutes away from the next destination at Granite Point platform.  AR US002486–87 (USCG Captain Interview).  Captain Bucklin soon assessed, however, that the MONARCH was only about ten minutes away from the platform.  *Id.*  Since Chief Mate Hebb had previously called Granite Platform at 5:13 a.m., and given the incorrect expected arrival time, Captain Bucklin called back at 5:20 a.m., to correct Chief Mate Hebb's prior estimation.  AR US002474 (USCG Hebb Interview); AR US002486–87 (USCG Captain Interview); AR US002524 (MONARCH Phone Log).

When Captain Bucklin relieved the Chief Mate, the MONARCH was moving in the dark through heavy ice, "with some ice pans as thick as 3 feet."  AR US003774 (USCG Report); AR US002254 (Chief Mate Supp. Statement); AR US002486 (USCG Captain Interview).  Consequently, the MONARCH was not able to "follow[] a straight line" to the next platform.  AR US002487 (USCG Captain Interview).  Navigating through heavy ice requires the selection

of "ice leads,"[10] or cracks in the sea ice, to allow the vessel to move, but typically on an indirect

trajectory toward the intended destination. *See* AR US002479 (USCG Hebb Interview,

explaining that when operating in heavy ice, "[t]here are places where two pans meet, where you

can cut through" and thus "you can't just go on like a nice straight course[,] . . . you're spending

time going left, going right, going left, going right, . . . so it's not a standard course").  This is

what Captain Bucklin did: he maneuvered the MONARCH into ice leads of open water or

thinner ice, using "standard ice procedures" requiring the vessel to "follow the path of least

resistance, which is not necessarily directly towards your destination."  AR US002487 (USCG

Captain Interview).  Captain Bucklin described this maneuvering as follows:

> Sometimes you just got a lead that this goes this [w]ay, let's take this, and then you have
> to make it up because you had to go around a big pan, or just, you know, you would see a
> way off the port, for example, to go around a pan. You go around the pan and then you
> make your way back to starboard.

*Id.*

During this maneuvering, if the vessel hit "a pan of [thick] ice, [the ice would] break[]

and knock[]" the vessel in another unintended direction.  *Id.*  According to Captain Bucklin, due

to the presence of ice, the vessel might have to be up to ninety degrees off course for an extended

period of time before the course could be corrected, "partly on purpose, partly by

circumstances."  *Id.*; *see also* AR US002450 (USCG Interview of Deck Hand Steven Shangin

(Jan. 21, 2009) ("USCG's Shangin Interview")), stating that because of the thick ice, the

MONARCH had to "back up" at least "[a] couple of times").  Chief Mate Hebb explained that

while "navigating . . . on a straight course" a vessel operator might "look[] farther, maybe out in

---

[10]     A "lead" is a "fracture or passage-way through ice which is navigable by surface vessels."  Sea Ice
Glossary, Woods Hole Oceanographic Institution,
http://www.whoi.edu/science/PO/arcticedge/arctic_west03/facts/facts_ice.html (last visited Dec, 20, 2016); *see also*
*Lead,* Merriam-Webster Dictionary Online, http://www.merriam-webster.com/dictionary/lead (last visited, Dec. 20,
2016).

the distance or something," but, by contrast, "[w]hen we're operating [in] the ice, we're operating under sodium lights, so we can light up the ice so we can see." AR US002479 (USCG Hebb Interview). For this reason, a vessel operator has to "balance . . . time by looking farther and looking right up in front of your boat because you're constantly change course to find the, quote, 'easier way' through the ice." *Id.*

The necessity of using these standard ice procedures resulted in the MONARCH being "gradually steered off the intended course" by Captain Bucklin into the direction of the flood tide, which was producing a 5.5 knot current in the northerly direction. AR US003764, 3775 (USCG Report). Nevertheless, the USCG found that Captain Bucklin was "correct in maneuvering the vessel through the ice as he did." AR US003793 (USCG Report). Yet, by focusing his attention on maneuvering the vessel in this manner, the USCG also determined that Captain Bucklin "lost focus on the large situation he was placing the vessel in and assumed he was on the correct course when in fact, because of the variation in course directions to avoid ice, the vessel was on the wrong approach towards the platform." *Id.* In other words, Captain Bucklin "lost situational awareness" due to the navigational necessities of moving the MONARCH in the extant conditions of heavy ice. AR US003792. The USCG Report stressed multiple times that "immediately prior to the casualty the Master was struggling to keep the vessel clear of heavy ice and lost situational awareness of the course the vessel was heading as he maneuvered around the ice." *Id.*; *see also, e.g.,* AR US003764 ("The Master was fatigued that morning and unable to properly maintain the level of situational awareness necessary to ensure the MONARCH's correct navigational approach to the GRANITE POINT Platform."); AR US003792 ("In effect, the Master lost situational awareness by having tunnel vision concerning the thick ice instead of assuring the correct course the vessel should have been

transiting in order to approach the Platform from the correct direction."); AR US003793 ("[T]he

master lost focus on the large situation he was placing the vessel in and assumed he was on the

correct course when in fact, because of the variation in course directions to avoid ice, the vessel

was on the wrong approach towards the platform.").

As the MONARCH approached the platform, Captain Bucklin explained that the vessel

"[b]usted through heavy ice" and hit "bands of heavy ice interspersed with moderate ice and

slush and slushy goo."  AR US002487 (USCG Captain Interview).  After five to ten minutes

"beating through the heavy ice," the vessel emerged from the heavy ice and was "through into

the moderate stuff" but Captain Bucklin then "realized [the vessel was] close to the platform."

*Id.*  Further complicating the situation, rather than passing the Granite Point platform on the west

side as intended, the MONARCH was positioned so that the current, then at the height of the

flood tide, along with the force of the ice, pushed the port stern of the MONARCH into the

southwest corner leg of the Granite Point platform, breaching the MONARCH's hull at 5:46

AM.  AR US003775-76, US003792 (USCG Report).  With the port stern forced against the

southwest corner of the platform, the current and ice then also forced the port bow against the

southeast leg of the platform, "pinning" the vessel to the platform perpendicular to the strong

flood tide.  *Id*. at AR US003764 ("[T]he current pinned the vessel against 2 legs of the

GRANITE POINT Platform and subsequently pushed ice on deck.").

Prior to impact, Captain Bucklin realized his mistake and tried to correct it.  He explained

that he "jammed the throttles forward and put the jog stick hard right," but the response from the

vessel was "minimal."  AR US002488 (USCG Captain Interview).  He attributes the minimal

response to the fact that the MONARCH was in "slushy gooey broken ice" that prevented the

stern from moving.  *Id.*  The USCG Report noted that had Captain Bucklin "realized his situation

sooner he would have called off the approach and tried again or . . . waited until the ice coverage abated or tide changed." AR US003793. Unfortunately, however, "by maneuvering through heavy ice by trying to find open or lighter ice," in the view of the USCG, Captain Bucklin had lost "situational awareness" by focusing on his maneuvers through the thick ice. *Id*. at AR US003792.

Captain Bucklin confirmed that he "misread the orientation of the platform," and added that "when [he] realized [his] mistake, the ice slowed the response of the vessel and [he] was unable to maneuver clear prior to hitting the granite [point] platform." AR US003847 (USCG Report, Supplemental Statement by Captain Bucklin). Other crew members familiar with the conditions in Cook Inlet corroborate the USCG's finding regarding the loss of situational awareness. Chief Mate Hebb explained that when "navigating in ice . . . it could be easy to get yourself" in the incorrect position because the vessel is forced to follow available ice leads. AR US002479-80 (USCG Hebb Interview). He expressed the "utmost sympathy, as other drivers do, for our captain because we all feel it could happen to us." *Id*. at US002480. Other crewmembers echoed Chief Mate Hebb's assessment of Captain Bucklin's handling of the incident. *See, e.g.*, AR US002484 (USCG Hebb Interview, stating that "every one of the [crewmembers] said [they] would sail with [Captain Bucklin] again" and told him to tell Captain Bucklin that they didn't "hold him responsible [and] . . . it could have happened to anybody"); AR US002450 (USCG Shangin Interview, stating "I would sail with [Captain Bucklin] any time again. He knew what he was doing. He was a good boat operator, if you ask me. He was doing everything. I think he did everything right."); AR US002464-65 (USCG Sisson Interview, characterizing Captain Bucklin as "a good captain. I wouldn't hesitate to get back on a boat with him in a minute" and

opining that Captain Bucklin "did everything he could to save" the MONARCH, that "[h]e never put us in harm's way on purpose," but that the allision was "beyond his control").

At 5:44 a.m. and 5:45 a.m., shortly before the allision, Captain Bucklin placed two unanswered calls to the ANNA platform, which was the next stop after Granite Point, to advise that the MONARCH was approximately thirty minutes away.  AR US003776 (USCG Report); AR US002524 (MONARCH Phone Log).  Such calls between supply vessels and platforms are routine to keep the platform apprised of the vessels' estimated time of arrival so that the platform is adequately and timely prepared.  *See* AR US002524 (MONARCH Phone Log showing regular calls made from the MONARCH to the Anna, Granite Point, Monopod, Dolly Varden, and Steelhead platforms); AR US002473 (USCG Hebb Interview, explaining that "[w]e always call the platforms on the telephone before we get up there and start to work.").  For example, when Captain Bucklin called the Granite Point platform at 5:20 a.m., the platform responded by noting that the crane operator was getting in "the crane right then."  AR US002486 (USCG Captain Interview).

The allision with the platform pierced the MONARCH's hull, damaging the vessel's fuel tanks and allowing water to pour into the vessel.  AR US003761, 3779–83 (USCG Report).  Given the frigid conditions, ice began piling up on the stern.  *Id*. at AR US003782-83.  All seven crew members evacuated to the platform before ice caused the MONARCH to capsize, and eventually sink.  *Id*. at AR US003782.  Approximately 38,000 gallons of fuel, lube, and generator oil were released into Cook Inlet.  *Id*. at AR at US003761–62; AR US002644 (GDS Report).  OMSI subsequently began an oil spill response, which included recovering 12,445 gallons of oil.  AR US000169 (Pl.'s Pollution Response Incident Report).  The plaintiff, as OMSI's insurer, incurred $2,698,159.59 in expenses in removal costs and expenses, and issued a

claim for $1,898,159.59 (the total expenses "less [the] $800,000 limit" on liability as set forth in 33 U.S.C. § 2704(a)(2)).  AR US000002 (Pl.'s Claim Letter to NPFC).

### C.    Coast Guard Investigation

Regional USCG units are tasked with undertaking marine casualty investigations to determine measures to promote safety at sea.  *See* 46 U.S.C. § 6305; 46 C.F.R. §§ 4.01-1, 4.07–10.  Here, the USCG unit stationed at the Gulf of Alaska and familiar with the local conditions undertook an "informal" investigation.  AR US003761 (USCG Report).  Although the incident met "the criteria for a formal investigation, the Officer In Charge, Marine Inspection for Western Alaska[,] down-grade[d] the level of investigative effort to that of an informal investigation . . . ."  *Id.*

The USCG's investigation was initiated immediately following the incident in January 2009 and involved a thorough review of the circumstances leading up and occurring at the time of the allision.  As part of its investigation, the USCG conducted interviews of and obtained statements from crewmembers within the month after the incident.  AR US03795 (USCG Report).  The USCG also reviewed crewmember drug tests and work/rest history for at least ninety-six hours prior to the incident, with the results of this review documented in the USCG Report.  AR US003769–70, 3796–99, 3818–33, 4007–60, 3770–73, 3806–07.  In addition, the USCG collected and examined relevant documentation, such as: (1) drawings and photographs of the MONARCH prior to the incident and as it sank, and photographs of the Granite Platform the day following the incident, AR US003803–05; (2) MONARCH log book entries for January 2009, AR US003806; (3) Tide and Current Data for the area where the MONARCH sank, AR US003803; (4) the MONARCH's phone records for January 14 and 15, AR US003808; (6) review of extracts of 2009 Coast Pilot navigational information for the Cook Inlet, including the

Ice Guidelines and information regarding significant tides and current, AR US003808, 4090–96; and (7) Charts of the MONARCH's time, position, and course information recorded every five minutes on January 15, 2009, AR US003808.

Based on this investigation, the USCG identified two factors as "the primary contributors to the sinking of the OSV MONARCH": "(1) the Cook Inlet environmental conditions," which had strong current and ice conditions, and "(2) crew fatigue," stemming from the crew's difficulty getting sufficient rest during their 6 hours off-watch because "when the vessel operated in ice, sleep was often unobtainable or interrupted."  AR US003764 (USCG Report); *see also* AR US002464 (USCG Sisson Interview, stating that he did not get much sleep the night before the incident "[b]ecause of the ice" and that "normal[ly], in the ice when you're working, if you can get two to three hours of sleep a night, you're doing good. You had a good night"); AR US002466 (USCG Tomlinson Interview, stating that on the way to the Granite Point platform, the MONARCH "hit some more heavy ice" which "woke the rest of the crew, except for the engineer").  While acknowledging that "[m]ost casualties cannot be attributed only to one causal factor," the USCG commented on the inter-relationship of these two primary factors, stating that "in the OSV MONARCH case, the master's fatigue played a role as significant as the environmental conditions."  AR US003764 (USCG Report).

The USCG noted that the "Master was using the vessel's phone to contact the ANNA Platform at 0544 and 0545 to give the ANNA Platform 30 minute notice before delivery supplies" but "was not able to contact the Platform with the first call at 0544 nor with the second attempt at 0545."  AR US003776.  The USCG, however, did not cite these brief calls as contributing in any way to the allision.

Following the investigation, the USCG filed administrative enforcement proceedings against Captain Bucklin, alleging "misconduct" because he "allowed one or more watertight doors to remain open" and "negligence" because, after he assumed navigational duties of the MONARCH, the vessel "struck a fixed object, the oil platform," and then "overturned and eventually sank next to the oil platform" with diesel fuel and lube oil onboard.  AR US003222 (USCG Suspension & Revocation ("S&R") Complaint filed in August, 2009).  Without admitting any liability, Captain Bucklin agreed, in September 2009, to settle this administrative matter with "a mitigated sanction of 4 months suspension on 24 months [sic] probation."  AR US003245 (Settlement Agreement between Captain Bucklin and USCG).

### D.    Agency Proceedings

In January, 2012, the plaintiff submitted to the NPFC a reimbursement claim totaling $1,898,159.59 for uncompensated oil removal costs.  AR US000001–2 (Pl.'s Claim Letter to NPFC).  In response to NPFC's request, the plaintiff subsequently supplemented its claim with roughly 300 pages of additional information.  AR US002230 (Pl.'s Letter to NPFC Claims Manager (Mar. 23, 2012)).  In the plaintiff's view, the documentation "clearly demonstrates that the loss was not in any way caused by gross negligence, willful misconduct or violation of regulation."  *Id*.  The NPFC disagreed with the plaintiff's assessment in two denial decisions summarized below.

### 1.    The First Denial Decision

Over one year after submission of the plaintiff's claim, the NPFC requested, on March 27, 2013, that the plaintiff produce an engineering report and other documentation to determine whether the plaintiff met the prerequisites to limit its liability for removal costs.  AR US002539–40 (Letter from NPFC Claims Manager to plaintiff (Mar. 27, 2013)).  In response, the plaintiff

provided the GDS engineering report; detailed answers to NPFC's questions; a case study

prepared by Aasgard Summit Management Services; and a CD-ROM containing a PowerPoint

presentation, photographs, and computerized video of the MONARCH making its approach to

the Granite Point Platform.  AR US002543–2546 (Pl.'s Letter to NPFC Claims Manager (Aug. 5,

2013)).  The plaintiff also submitted to the NPFC the USCG investigative file on the incident

that the plaintiff had obtained through a Freedom of Information Act ("FOIA") request.  AR

US003210–3488 (Pl.'s Letter to NPFC Claims Manager (Sept. 30, 2013)).

Over six months after the last submission by the plaintiff, the NPFC denied the plaintiff's

claim on June 30, 2014, finding that the plaintiff was not entitled to the limitation on liability

because Captain Bucklin had been grossly negligent.  AR US003489–95 (First Denial Decision).

In a six-page "Claim Summary/Determination," the NPFC highlighted the treacherous or

"extreme" conditions in which the MONARCH was traveling on the day of the allision: "the

vessel was traveling on a flood tide from the south [with] a 5.5 knot current in heavy pack ice

with thickness reported as between 16-24 inches covering most of the waterway, . . . in the dark,

[and] [w]ind was 20 knots . . . ."  AR US003491–2.  The NPFC credited Captain Bucklin with

having "the normal or intended approach under the prevailing conditions" to the Granite Point

platform, AR US003493, but concluded this intended approach "did not happen because Captain

Bucklin did not begin maneuvers until the vessel was only a couple of hundred yards from the

platform and there was insufficient time and distance under the conditions to come about for a

controlled approach," AR US003492.  The maneuvers attempted by Captain Bucklin were

unsuccessful because he "got minimal response" from the vessel's controls and "the vessel was

pushed towards the platform abeam the current."  *Id*.  The NPFC also remarked that

"[i]explicably . . . in the midst of the last minute attempts to maneuver the vessel and avoid the

allision Captain Bucklin made or attempted to make phone calls to the Anna Platform which was next in line for deliveries after the Granite Point Platform." *Id*.

The NPFC's analysis of the facts is entirely silent about the USCG's findings regarding the Captain's lack of situational awareness due to navigating the MONARCH through heavy ice in the dark, despite the USCG's repeated description of this critical context for both the otherwise "inexplicable" phone calls and belated maneuvers.  In a brief one-paragraph section discussing the USCG's report, the NPFC acknowledged the USCG's contrary conclusion that the "causes of the allision were lack of situational awareness and fatigue."  AR US003494.  Without any specific response or critique, however, the NPFC summarily noted that the USCG report is "[n]ot dispositive" and that "the NPFC is not bound by such reports of investigation, and can find additional or even different facts and reach different opinions or conclusions than those in the" USCG reports.  AR US003494-95.

Based on this abbreviated rendition of the facts, the NPFC then evaluated whether the Captain's conduct amounted to gross negligence.  The NPFC's analysis of this issue relied on definitions of "negligence" and "gross negligence" employed in an earlier NPFC administrative decision.  Specifically, the First Denial Decision defined "negligence" as "a failure to exercise the degree of care which a person of ordinary caution and prudence would exercise under the circumstances.  A greater degree of care is required when the circumstances present a greater apparent risk[;]" and "gross negligence" as "when there is an extreme departure from the care required under the circumstances or a failure to exercise even slight care."  AR US003493 (citing *Kuroshima Shipping S.A. Act of God Defense and Limit of Liability Analysis*, Claim No. 178010-001, 2003 AMC 1681, 1693, 2003 WL 22103332 (NPFC June 23, 2003) ("*Kuroshima*")).  In applying these definitions, the NPFC found that the extreme conditions requiring navigation of

"the vessel using leads in the ice, or fracture in the thick pancake ice," posed an "increased risk [and] a greater degree of care was required." *Id*. Noting that "[t]he intended or usual approach with a flood current and heavy ice conditions would be to slow the vessel and allow the current to push the vessel to the north of the platform and to 'arrive at the Granite Point Platform on its east or west side and then place the bow into the north-flow flood tide,'" *id.*, the NPFC pointed to Captain Bucklin's "admi[ssion] during his deposition that he missed the point of slowing his vessel which would have allowed for a proper approach" and that he "realized he was 90 degrees off from his intended approach when he was only 200 yards from the platform," US003493–94. The NPFC then concluded that "[c]learly Captain Bucklin's negligent navigation of the vessel was the proximate cause of the incident." *Id.*

The First Denial Decision identifies two factors that catapult the finding of "negligent navigation" into the realm of "gross negligence." The first factor cited by the NPFC is "Captain Bucklin's failure to determine the actual position of his vessel with regard to distance and approach to the platform when he relieved the watch." AR US003494. As support for this finding, the NPFC indicates, without citation to the investigative record compiled by the USCG, that "at the time of relief," Captain Bucklin "estimated the vessel was 35-45 minutes out from the Granite Point Platform." AR US003492. The NPFC does not address contrary evidence in the USCG record that the incorrect vessel location information did not originate with the Captain but was relayed *to* him by Chief Mate Hebb shortly before the Captain assumed the watch. AR US002486–87 (USCG Captain Interview). The NPFC credits Captain Bucklin with "soon realiz[ing] that he was closer to the platform than he originally thought when he assumed the watch," AR US003492, but still faults him for "fail[ing] to determine the actual position of the vessel when he assumed the watch," AR US003494, presumably because he failed to do this

19

"soon" enough.  The NPFC is vague on precisely when the Captain did figure out the MONARCH's correct distance from the Granite Point Platform, even though this information is available in the USCG investigative record.  Specifically, interviews and statements from both Mate Hebb and Captain Bucklin confirm that Captain Bucklin corrected Mate Hebb's estimated distance at about the same time as he assumed the watch, only to lose situational awareness in transit through the ice to the platform.  *See, e.g.*, AR US002478-79 (USCG Hebb Interview).

The second factor cited by the NPFC to support the finding of gross negligence is Captain Bucklin's "inattention to the circumstances of the vessel in the last minutes before the allision, as indicated by the phone calls to another platform."  AR US003494.  This finding is made without addressing the contextual circumstances described in the USCG Report that Captain Bucklin placed the two phone calls at a time when he had lost situational awareness through his navigational maneuvers through thick ice.  AR US003764 (USCG Report). Nonetheless, the NPFC concluded that these factors showed "an extreme departure from the degree of care required under the circumstances or a failure to exercise even slight care."  *Id.*

## 2.    The Second Denial Decision

On December 1, 2014, after receiving an extension on the filing deadline, *see* AR US003596–98 (E-mail from NPFC Claims Manager to plaintiff (Aug. 13, 2014), granting 90-day extension to file request for reconsideration), the plaintiff submitted a reconsideration request for its reimbursement claim, AR US003496–507 (Pl.'s Request for Reconsideration).  The plaintiff waited over a year and half after requesting reconsideration without any response from the NPFC.  Consequently, the plaintiff advised the NPFC that it intended to file the instant action if a

favorable disposition was not issued before May 29, 2015.  AR US003602 (Pl.'s Notice of Intent to File (May 18, 2014)).

In the face of continuing silence from the NPFC, the plaintiff filed this action on May 29, 2015.  *See* Compl., ECF No. 1.  Two months later, on July 21, 2015, with the benefit of having the plaintiff's critique of the First Denial Decision outlined in the Complaint, the NPFC again denied the plaintiff's reimbursement claim, "in accordance with 33 U.S.C. § 2704(c)(1)(a) on grounds Claimant was not entitled to a statutory limitation of liability because the incident was proximately caused by the gross negligence of the responsible party."  AR US003534 (Letter from NPFC to plaintiff (July 21, 2015) ("Second Denial Decision")).  Without addressing the timeliness of the Second Denial Decision, the NPFC deemed this decision to be "the final agency action on the Claimant's claim."  AR US003537.

The 14-page Second Denial Decision is double the length of the First Denial Decision and includes the NPFC's consideration of supplemental declarations by Captain Bucklin as well as Captain James Wright, an expert "Harbor Pilot . . . with almost 30 years of experience operating as a pilot in the Cook Inlet," submitted by the plaintiff with the request for reconsideration.  AR US003535, 3539 (Second Denial Decision).  The NPFC again rejected the plaintiff's argument, which had been summarily rejected in the First Denial Decision, that denial of the liability limitation was not warranted since the investigations conducted by a USCG component and the Alaska Department of Environmental Conservation—government agency components arguably more familiar with the conditions in Cook Inlet than the NPFC—had not found evidence of, nor levied penalties for, gross negligence.  AR US003535-37.  Without any specific critique of those investigations or their conclusions, the NPFC merely noted that it was "not bound by such reports of investigation."  AR US003540.

Although the ultimate conclusion is the same, the Second Denial Decision differs from the First Denial Decision, in both its rendition of the facts and its legal analysis, in at least four significant respects.  First, the Second Denial Decision does an about-face from the First Denial Decision's assessment of Captain Bucklin's initial navigational decisions.  The First Denial Decision expressly faulted Captain Bucklin for "fail[ing] to determine the actual position of the vessel when he *assumed the watch*."  AR US003494 (First Denial Decision) (emphasis added).  By contrast, the Second Denial Decision hews more closely to the investigative record by noting that Captain Bucklin initially "receiv[ed] incorrect information from Mr. Hebb" and credits the Captain with "quickly realiz[ing]" the correct location of the MONARCH *vis-à-vis* the Granite Point Platform.  AR US003536.  Based on this fact, the Second Denial Decision concludes "that Captain Bucklin had situational awareness, knew the location and speed of MONARCH and his distance from Granite Point when he took the watch from Mate Hebb at 0520."  AR US003543.  In other words, the NPFC's initial factual determination regarding the Captain's failure to learn the MONARCH's location when he relieved the watch, on which the First Denial Decision's conclusion of gross negligence was based, *see* AR US003494 (First Denial Decision), is jettisoned in the Second Denial Decision's analysis of the facts.

Second, the NPFC also reaches a different conclusion with regard to the timing of Captain Bucklin's two brief unanswered phone calls to the ANNA platform shortly before the allision.  The First Denial Decision described these calls as being made "[i]nexplicably" when Captain Bucklin was "*in the midst* of the last minute attempts to maneuver the vessel and avoid the allision," AR US003492 (First Denial Decision) (emphasis added), and cited these calls as evidence of his "inattention" underlying the initial finding of gross negligence, AR US003494 ("Regardless of the purpose of those calls we find that attempting or making calls to another

platform in the midst of the last minute maneuvers are an extreme departure from the degree of care required under the circumstances or the absence of even slight care."). The Second Denial Decision corrects the timing of these phone calls as occurring "seconds" *before* Captain Bucklin "realized the vessel was only 200 yards from the platform," at which point "[i]t was impossible to slow the vessel and navigate against the current to the platform," as he had originally intended. AR US003536 (Second Denial Decision). In other words, the two calls initially described as "inexplicably" placed while Captain Bucklin was conducting his final maneuvers are instead described as taking place *before* Captain Bucklin's realization of his uncontrolled approach to the platform. Despite the NPFC's correction about the timing of the calls, the Second Denial Decision again does not acknowledge the USCG's repeated contextual findings that the Captain had lost situational awareness at the time of the calls due to navigating the MONARCH in the dark through leads in thick ice.

Third, the legal analysis in the Second Denial Decision discusses at length the principle "under admiralty law that a vessel will presumptively be at fault when it allides with a stationary object," AR US003538, which was not mentioned at all in the First Denial Decision. The Second Denial Decision does not explain, however, how this principle, which creates a *prima facie* case of negligence, necessarily implies that Captain Bucklin was *grossly* negligent. *See Bessemer*, 596 F.3d at 362; *see also Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 210 (2d Cir. 2009) ("It is a well-established proposition of maritime collision law that when a moving vessel collides with a stationary object, an inference of negligence arises and the burden is then upon the owners of the vessel to rebut the inference of negligence.").

Certainly, the fact that an allision occurred is not, standing alone, sufficient to trigger a finding of gross negligence, and the NPFC does not so assert.[11]

Finally, although the NPFC again applies the same definition of gross negligence used in the 2003 NPFC administrative decision in *Kuroshima*, the Second Denial Decision employs different reasoning not referenced in the First Denial Decision that the allision was caused by a "series of negligent acts of Captain Bucklin and these instances of negligence taken together constitute gross negligence." AR US003545. The following two "instances" are identified as support for this conclusion on reconsideration: (1) "Captain Bucklin was distracted because he made two telephone calls two and one minute prior to the allision"; and (2) "[Captain Bucklin] failed to safely slow the vessel in order to make a controlled and safe approach to Granite Point Platform." *Id*. The second instance is also blamed on the Captain being distracted by placing the two telephone calls. *See* AR US003545 ("[T]he distraction caused by the telephone calls resulted in Captain Bucklin's failure to maintain a safe speed as he approached the Granite Point platform.").

The NPFC acknowledges in the Second Denial Decision a factor cited repeatedly in the USCG Report that "the Master's loss of situational awareness may have been one of the factors leading up to the incident," AR US003540, an acknowledgement that stands in contrast to the First Denial Decision, which was silent in its analysis about the Captain's loss of situational awareness. The NPFC attributes this "lost awareness" to the two telephone calls placed by the Captain rather than the fact that the Captain was navigating the MONARCH in the dark through

---

[11]     In this regard, USCG personnel in Anchorage communicated to the NPFC that the environmental conditions are such in Cook Inlet that allisions "happen often" and are "so common." AR US003619 (E-mail from USCG Anchorage Officer to NPFC Claims Manager ((Feb. 9, 2015), noting that "multiple allisions which have taken place over the two years [he had] been in []his seat, they happen often . . . the issue . . . is that they are not reported.").

heavy ice and disorienting ice leads.  AR US003545 ("He lost awareness two minutes prior to the allision because he was distracted by the two phone calls he made to Anna Platform."); *id.* ("The NPFC finds that the telephone calls were a distraction and were an occurrence that proximately caused to [sic] incident.").  This finding blaming the calls for the loss of situational awareness is difficult to reconcile with the NPFC's other finding that the calls were, in fact, made *before* Captain Bucklin realized the MONARCH was close to the platform.  AR US003536.  The latter finding indicates that when the calls were placed, the Captain had already lost situational awareness, rather than losing it due to the calls.  In any event, the Second Denial Decision discounts as "not convincing" the Captain's express denial that the calls were a distraction, despite apparently concurring with his explanation that the calls occurred before "he realized his miscalculation" about his distance from the platform.  AR US003544.

The NPFC also discounts the expert statement of Captain Wright that "the attempted telephone calls were not a distraction" contributing to the allision.  *Id.*[12]  The Second Denial Decision "accepts Captain Wright's calculation that the vessel could have traveled a quarter of a mile during" 45-50 seconds, the span of time Captain Bucklin estimated between the conclusion of his second attempted call to the Anna platform and the beginning of his maneuvers to "shape up his approach to the platform."  AR US003544.  Nonetheless, the NPFC speculates that "since the vessel at this time was 200 yards from the platform it is not clear that during those 45-50 seconds after making the second call Captain Bucklin had sufficient time to prevent an allision."  *Id.*  In reaching this conclusion, the Second Denial Decision again acknowledges the USCG

---

[12]     Captain Wright's declaration stated, in summary, that the unanswered calls were placed a sufficient, albeit short, time before the allision to have permitted maneuvering to prevent the allision had Captain Bucklin not lost situational awareness from navigating through the ice.  AR US003526–27 (Wright Decl., stating "Captain Bucklin did *not* make either [phone call] in the midst of last minute attempts to maneuver the vessel and avoid the incident.") (emphasis in original).  Further, Captain Wright averred that the "45–50 seconds [that] may have . . . elapsed . . . is a significant amount of time and the vessel could have travel[led] perhaps a quarter mile in this period."  *Id.*

Report's finding that Captain Bucklin had lost situational awareness due to the Captain's maneuvering through heavy ice." *Id.*  The Second Denial Decision, however, reasons that because "Captain Bucklin was aware of his location at the time he took the watch from Mate Hebb at 0520" and "knew that he was only 15 minutes out from Granite Point," which was correct information since the MONARCH "allided with Granite Point within five or ten minutes of his estimation," Captain Bucklin "lost awareness two minutes prior to the allision *because* he was distracted by the two phone calls he made to Anna Platform."  AR US003545 (emphasis added).  In other words, the NPFC pinpoints the time of the lost situational awareness and places it exactly when the telephone calls were made in order to identify those calls as the cause of Captain Bucklin's loss of situational awareness.

The NPFC does not explain why this telephone call theory is the more likely explanation for Captain Bucklin's loss of situational awareness than the USCG Report's conclusion— corroborated by Captain Wright, whom the NPFC recognizes is an "experienced pilot that often transits the waters of Cook Inlet," AR US003544, and by crewmember interviews—that the loss of situational awareness was due to Captain Bucklin's navigation, in the dark, through thick ice soon after he assumed the watch.  Similarly to the First Denial Decision, the Second Denial Decision summarily notes, and dismisses, the findings in the USCG Report.  AR US003540.

The arguments raised by the parties in their cross-motions for summary judgment are now considered.

## II.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56, summary judgment may be granted when the court finds "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a), (e)(3); *see Tolan v. Cotton*, 134 S. Ct.

1861, 1866 (2014) (per curiam); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986).  The

first part of the Rule 56 summary judgment standard regarding the absence of disputed material

facts, however, is irrelevant in APA cases since "'the district judge sits as an appellate tribunal'"

and "[t]he entire case on review is a question of law.'" *Rempfer v. Sharfstein*, 583 F.3d 860, 865

(D.C. Cir. 2009) (*quoting Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083–84 (D.C. Cir.

2001).  As such, "the complaint, properly read, actually presents no factual allegations, but rather

only arguments about the legal conclusion to be drawn about the agency action." *Id.* (*quoting*

*Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)).

Consequently, "[g]enerally speaking, district courts reviewing agency action under the APA's

arbitrary and capricious standard do not resolve factual issues, but operate instead as appellate

courts resolving legal questions." *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085,

1096 (D.C. Cir. 1996); *see also Lacson v. U.S. Dep't of Homeland Sec.*, 726 F.3d 170, 171 (D.C.

Cir. 2013) (noting, in APA case, that "determining the facts is generally the agency's

responsibility, not ours").

     Under the APA, a reviewing court must set aside a challenged agency action that is found

to be, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law." 5 U.S.C. § 706(2)(A).  The arbitrary or capricious standard, under subsection

706(2)(A), "is a catchall, picking up administrative misconduct not covered by the other more

specific paragraphs" of the APA.  *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors*

*of Fed. Reserve Sys.* (*ADPSO*), 745 F.2d 677, 683 (D.C. Cir. 1984) (Scalia, J.).

     The scope of review under the "arbitrary and capricious standard is 'highly deferential,'"

*Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 245 (D.C. Cir.

2013) (quoting *Am. Wildlands v. Kempthorne,* 530 F.3d 991, 997 (D.C. Cir. 2008)), and

"narrow," such that "a court is not to substitute its judgment for that of the agency," *Judulang v. Holder*, 132 S. Ct. 476, 483 (2011) (quotations omitted); *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016); *Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1135 (D.C. Cir. 2014); *Agape Church, Inc. v. FCC*, 738 F.3d 397, 408 (D.C. Cir. 2013). This "highly deferential" standard, which "presumes agency action to be valid," *Defs. of Wildlife v. Jewell*, 815 F.3d 1, 9 (D.C. Cir. 2016) (quotations and citation omitted), "is especially applicable [to] . . . 'technical determinations on matters to which the agency lays claim to special expertise,'" *Rosebud Mining Co. v. Mine Safety & Health Admin.*, 2016 WL 3606369, at *8 (D.C. Cir. July 5, 2016) (quoting *Bldg. & Constr. Trades Dep't, AFL–CIO v. Brock,* 838 F.2d 1258, 1266 (D.C. Cir. 1988)). Yet, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking." *Judulang*, 132 S. Ct. at 483–84. Simply put, "the agency must explain why it decided to act as it did," *Butte Cty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010), and the reason for the agency's decision must be "both rational and consistent with the authority delegated to it by Congress," *Xcel Energy Servs. Inc. v. Fed. Energy Regulatory Comm'n*, 815 F.3d 947, 952 (D.C. Cir. 2016).

In evaluating agency actions under the "arbitrary and capricious" standard, courts "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Ore. Nat. Res. Council,* 490 U.S. 360, 378 (1989) (quotations omitted) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe* (*Overton Park*), 401 U.S. 402, 416 (1971)); *Blue Ridge Envtl. Def. League v. Nuclear Regulatory Comm'n*, 716 F.3d 183, 195 (D.C. Cir. 2013). "An agency acts arbitrarily or capriciously if it has relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation either contrary to the evidence before

the agency or so implausible as to not reflect either a difference in view or agency expertise."

*Defs. of Wildlife*, 815 F.3d at 9.  When an agency "'fail[s] to provide a reasoned explanation, or

where the record belies the agency's conclusion, [the court] must undo its action.'"  *Cty. of L.A.*

*v. Shalala,* 192 F.3d 1005, 1021 (D.C. Cir. 1999) (quoting *BellSouth Corp. v. FCC*, 162 F.3d

1215, 1222 (D.C. Cir. 1999)); *see Select Specialty Hosp.-Bloomington, Inc. v. Burwell*, 757 F.3d

308, 312 (D.C. Cir. 2014) (noting that when "'an agency's failure to state its reasoning or to

adopt an intelligible decisional standard is . . . glaring . . . we can declare with confidence that

the agency action was arbitrary and capricious'" (quoting *Checkosky v. SEC*, 23 F.3d 452, 463

(D.C. Cir. 1994))).

At the very least, the agency must have reviewed relevant data and articulated a

satisfactory explanation establishing a "'rational connection between the facts found and the

choice made.'"  *Ark Initiative*, 816 F.3d at 127 (quoting *Motor Vehicle Mfrs. Ass'n of the U.S.,*

*Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)); *Am. Trucking Ass'ns, Inc.*, 724

F.3d at 249 (same); *see also EPA v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584, 1602

(2014) (holding that agency "retained discretion to alter its course [under a regulation] provided

it gave a reasonable explanation for doing so").  "[C]onclusory statements will not do; an

agency's statement must be one of *reasoning*."  *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343,

1350 (D.C. Cir. 2014) (quotations omitted).

Moreover, when review of an agency's action is "bound up with a record-based factual

conclusion," the reviewing court must determine whether that conclusion "is supported by

substantial evidence."  *Dickinson v. Zurko*, 527 U.S. 150, 164 (1999) (quotations omitted); *see*

*also Kappos v. Hyatt*, 132 S. Ct. 1690, 1695 (2012) (affirming review of "factual findings under

the APA's deferential 'substantial evidence' standard").  "Substantial evidence" is "enough

evidence to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury." *Defs. of Wildlife*, 815 F.3d at 9 (quotations and citation omitted).  Assessment of whether substantial evidence supports the agency's factual findings is based on consideration of the record "as a whole."  *Id.*; *see also Kaufman v. Perez*, 745 F.3d 521, 527 (D.C. Cir. 2014) (noting that agency factual findings may be "set aside . . . 'only if unsupported by substantial evidence on the record as a whole.'"  (quoting *Chippewa Dialysis Servs. v. Leavitt*, 511 F.3d 172, 176 (D.C. Cir. 2007))).

Notably, "an agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706," as does ignoring "evidence contradicting its position."  *Butte Cty.*, 613 F.3d at 194.  As the D.C. Circuit explained, an agency decision "would be arbitrary and capricious" if it is not "supported by substantial evidence" because "'it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense.'"  *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 604 (D.C. Cir. 2007) (quoting *ADPSO*, 745 F.2d at 684)).  Consequently, when assessing whether agency action is arbitrary or capricious, "in their application to the requirement of factual support[,] the substantial evidence test and the arbitrary or capricious test are one and the same."  *ADPSO*, 745 F.2d at 683; *accord CTS Corp. v. EPA*, 759 F.3d 52, 59 n.1 (D.C. Cir. 2014).

Judicial review is limited to the administrative record, since "[i]t is black-letter administrative law that in an [Administrative Procedure Act] case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision."  *CTS Corp.*, 759 F.3d at 64 (quotations and citations omitted; alteration in original); *see* 5 U.S.C. § 706 ("[T]he Court shall review the whole record or those parts of it cited by a party . . . ."); *Fla.*

*Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (noting, when applying arbitrary and capricious standard under the APA, "'[t]he focal point for judicial review should be the administrative record already in existence . . . .'" (quoting *Camp v. Pitts,* 411 U.S. 138, 142 (1973))); *Overton Park,* 401 U.S. at 420 ("review is to be based on the full administrative record that was before the [agency] at the time" of the challenged decision).

## III.   DISCUSSION

The plaintiff contends that the NPFC's First Denial Decision must be "set aside" as "arbitrary and capricious." Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem.") at 1-2, ECF No. 19-1. Specifically, the plaintiff challenges both (1) the factual support for the NPFC's conclusion regarding gross negligence, complaining that this conclusion was "based solely on speculation" and "conjecture," and was contrary to the "comprehensive contemporaneous casualty investigation" findings "by the Alaska Department of Environmental Conservation and United States Coast Guard (Sector Anchorage), who actually investigated the incident," Pl.'s Mem at 1-2, 19, 22; and (2) the NPFC's legal reasoning, contending that the agency "used a far-reaching net of 'gross negligence'" that resulted in misapplication "of its own definition of gross negligence" in a manner "inconsistent with its own reported precedent," Pl.'s Mem. Pts. and Auth. Reply to Def.'s Opp'n to Pl.'s Mot. Supp. Summ. J. and Opp'n to Def.'s Cross-Mot. for Summ. J. ("Pl.'s Reply") at 1, 3, 7. For its part, NPFC rests on the First and Second Denial Decisions, stating that "there is a rational connection between the facts in the record and the NPFC's adjudication, and therefore, the NPFC's decision is not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law." Def.'s Opp'n at 1.

As a threshold matter, the plaintiff demands that the NPFC's Second Denial Decision be stricken from the administrative record due to the NPFC's failure to respond in a timely manner

to plaintiff's reconsideration request within 90 days, as required by 33 C.F.R. § 136.115(d). Pl.'s

Mem. at 14, 28–31.  The issue of which NPFC denial decision constitutes the "final agency

action" subject to judicial review, *see* 5 U.S.C. § 704, is considered first, before turning to the

plaintiff's substantive challenges to the sufficiency of the factual support for the NPFC's key

findings and the adequacy of the agency's rationale.[13]

### A.    THE SECOND DENIAL DECISION IS STRICKEN AS UNTIMELY

The regulations implementing the OPA require the NPFC to notify the claimant in

writing of a reconsideration decision "within 90 days after receipt of the request for

reconsideration," and makes "[t]his written decision [] final."  33 C.F.R. § 136.115(d).  When,

however, the NPFC fails "to make final disposition of a reconsideration within 90 days after it is

---

[13]    The plaintiff posits that the NPFC bears the burden of demonstrating that the limitation of liability does not apply by showing gross negligence, Pl.'s Mem. at 18, while the government indicates that "the Court need not address Plaintiff's arguments regarding relative burdens of proof," because the NPFC's gross negligence finding was "based on the evidence in the record," Def.'s Opp'n at 39 n.31.  The parties appear to be talking past each other, due largely to plaintiff's reliance on an inapposite case.  The following three points are clear: First, the plain language of the OPA places the burden on the claimant to show entitlement to the limitation on liability, stating "[t]he responsible party … may assert a claim for removal costs and damages under section 1013 [33 USCS § 2713] *only if the responsible party demonstrates* that— . . . (2) the responsible party is entitled to a limitation of liability under section 1004 [33 USCS § 2704]."  33 U.S.C. § 2708(a)(2) (emphasis added)); *see also Bean Dredging, LLC v. United States*, 773 F. Supp. 2d 63, 86 (D.D.C. 2011) ("Congress explicitly placed the burden of proof on the responsible party to establish its entitlement to a limitation of liability."); *Water Quality Ins. Syndicate v. United States*, 632 F. Supp.2d 108, 114 (D. Mass. 2009) (holding that plain language of OPA requires the "plaintiff, not the United States," to "'demonstrate' that it is 'entitled to a limitation of liability" including that no exceptions apply).  Second, plaintiff relies on *Great American Insurance Company v. United States*, 55 F. Supp. 3d 1053 (N.D. Ill. 2014), for the proposition "that the limitation provision imposes no legal burden of proof on the responsible party to establish its right to limitation," Pl.'s Mem. at 19, which far over-states the holding of that case, which, in any event, is inapposite.  In that case, the NPFC denied a limitation on liability for clean-up of an oil discharge resulting from a barge explosion, the cause of which was unknown, based on the agency's speculation that gross negligence may have played a role.  55 F. Supp. 3d at 1065.  This agency decision was rejected by the court since "the NPFC did not find that any of the exceptions to limitation that are contained in § 2704(c)(1) apply to Plaintiffs' claims," *id.*, and mere speculation was not a finding.  By contrast, here, the NPFC has made a finding based on its view of the record evidence.  Finally, the denial of the limitation on liability due to the gross negligence exception, under 33 U.S.C. 2708(c)(1)(A), rests on a legal conclusion of the agency and, as the plaintiff points out, shifting the burden to the claimant "to prove the incident was not caused by gross negligence" would be "anomal[ous]" and require the claimant "to disprove the *ex post facto* opinions of the NPFC," which is "illogical, particularly since the NPFC keeps moving the target once [the plaintiff] hits it."  Pl.'s Reply at 17.  This final point confuses the different standards applicable to administrative review of a claim and judicial review of the agency's action.  In sum, while the OPA places the burden squarely on the claimant to show entitlement to the limitation on liability before the NPFC, the NPFC must base denial of the claim on substantial evidence in the record to withstand review under the APA.

received," the untimely decision "shall, at the option of the claimant any time thereafter, be deemed a final denial of the reconsideration." *Id*. These regulations give the claimant the "option" *not* to consider an untimely reconsideration decision to be the final agency action, in which case the first, rather than the reconsideration, denial decision constitutes the final agency action. Thus, the untimely Second Denial Decision is the final agency action only if the plaintiff has "opt[ed]" to "deem[]" it as such. *Id*. The plaintiff has not done so here, as the procedural history of this case and the briefing on the pending cross-motions makes plain.

After receiving an extension on its filing deadline to request reconsideration, the plaintiff filed a reconsideration request on December 1, 2014. AR US003496–3528 (Pl.'s Request for Reconsideration). On May 29, 2015, more than ninety days after the reconsideration request was submitted, the plaintiff filed the instant complaint, which contains allegations expressly noting the NPFC's failure to respond to the reconsideration request within the requisite ninety-day period and deeming the First Denial Decision to be the final agency action. *See* Compl. ¶ 33 (citing 33 C.F.R. § 136.115(d)). Merely because the plaintiff sought reconsideration and the NPFC eventually issued a Second Denial Decision, does not supplant the administrative right of the plaintiff to opt to treat only the First Denial Decision as the final agency action. Indeed, the plaintiff did not amend the complaint or otherwise indicate that it opted, under 33 C.F.R. § 136.115(d), to consider the Second Denial Decision to be the final denial. To the contrary, the plaintiff has sought to strike this reconsideration decision from the administrative record.

The government does not dispute that the Second Denial Decision was untimely or that the plaintiff has opted not to deem this decision to be the final agency action. Nonetheless, the government objects to striking the Second Denial Decision for two reasons, neither of which is persuasive. First, the government asserts that the plaintiff "overlook[s] a fundamental tenant

[sic] of administrative law," that a "reviewing court must be satisfied that the agency considered the relevant factors and provided a sufficient explanation for its decision or it may find the agency's actions arbitrary and capricious." Def.'s Opp'n at 40. The government uses this legal principle as a springboard to offer a pragmatic rationale for treating the Second Denial Decision as the final decision, since that decision "elaborated on its reason for denying limitation, illuminating the agency's thinking process," as well as considered "new evidence submitted by WQIS and included in the administrative record submitted to the Court." *Id.* In the government's view, this expanded agency reasoning should benefit the claimant and facilitate judicial review. *Id.* at 39–42.

The principle that an agency must consider the relevant factors and provide a sufficient explanation for its decision may be a correct statement of the applicable standard of review under the APA, but the government misses the point. The government seeks here to apply this standard to evaluate the factual and analytical sufficiency of an untimely, claimant-rejected Second Denial Decision, which, consequently, is not the NPFC's "final agency action" correctly subject to judicial review. Whether this result "makes sense," as the government frames the outcome it urges, is not a legal standard, no matter how conveniently invoked as a "beneficial" or "sensible" guidepost. *See* Def.'s Opp'n at 40–41. Instead, as summarized *supra* in Part II, judicial review under the APA is limited to the administrative record utilized by the agency at the time it made its final decision. *See Florida Power & Light Co., v. Lorion*, 470 U.S. 729, 743-44 (1985); *Camp*, 411 U.S. at 142. Even if the NPFC's Second Denial Decision "elaborated on its reason for denying limitation" and "illuminated the agency's thinking process," Def.'s Opp'n at 40, this does not give the Court license to consult extra-record evidence. *See Hill Dermaceuticals, Inc. v.*

*Food & Drug Admin.*, 709 F.3d at 47; *Motor & Equip. Mfrs. Ass'n Inc. v. EPA,* 627 F.2d 1095, 1104 n.18 (D.C. Cir. 1979) ("supplementation of the record . . . is the exception not the rule").[14]

Second, the government cautions that if the Second Denial Decision is stricken, all additional materials submitted by the plaintiff to the NPFC after the First Denial Decision should also be stricken, a result that, in the government's view, "makes little sense." *Id.* at 41. This amounts to yet another pragmatic reason for denying the plaintiff's request to strike the Second Denial Decision. As noted above, however, the law requires that the administrative record be limited to the material before the agency at the time the challenged final decision was made. These constraints on judicial review under the APA must guide this Court, and not the boundaries of what the government suggests would be the most convenient, helpful, or sensible for the parties or the Court.[15] *See Am. Coke & Coal Chems. Inst. v. EPA*, 452 F.3d 930, 945 (D.C. Cir. 2006) (excluding from judicial consideration in APA challenge, data not before the agency at the time of the final agency action).

Accordingly, the Second Denial Decision and the materials submitted by the plaintiff to the NPFC in connection with the reconsideration request are stricken from the administrative record and not considered as part of this Court's review of the First Denial Decision.

---

[14] The D.C. Circuit has recognized "quite narrow and rarely invoked" exceptions to this rule barring consideration of extra-record material and limited the exceptions to cases where "the procedural validity of the agency's action remains in serious question or the agency affirmatively excluded relevant evidence," and "resort to extra-record evidence may, for example, help the court to determine whether the administrative record is deficient in the first place." *CTS Corp.*, 759 F.3d at 64 (internal quotations and citations omitted). Even then, the exception "at most . . . may be invoked to challenge gross procedural deficiencies—such as where the administrative record itself is so deficient as to preclude effective review." *Id.* (quoting *Hill Dermaceuticals*, 709 F.3d at 47) (ellipses in original). This case simply does not fall into one of these "narrow" exceptions and the parties do not argue otherwise.

[15] In any event, as discussed *infra* at n.17, even if the Second Denial Decision and the additional record material on reconsideration were considered, the result in this case would be the same.

### B.      THE NPFC'S FACTUAL FINDINGS ARE FLAWED

In reviewing the NPFC's First Denial Decision under the APA, the Court is mindful that

it may not "substitute its judgment for that of the agency," *State Farm*, 463 U.S. at 43, and that

deference must be given to the agency's factual conclusions, even if reasonable minds could

reach different conclusions, *see Multimax, Inc. v. FAA*, 231 F.3d 882, 887-888 (D.C. Cir. 2000)

("The question [the court] faces is 'not whether [petitioner's] view of the facts supports its

version of what happened, but rather whether the [agency's] interpretation of the facts is

reasonably defensible." (quoting *Harter Tomato Prods. Co. v. NLRB*, 133 F.3d 934, 938 (D.C.

Cir. 1998) (brackets in original))); *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089

(D.C. Cir. 2009) (noting that agency's factual findings may be adopted "as conclusive if

supported by substantial evidence . . . even though a plausible alternative interpretation of the

evidence would support a contrary view" (quotations omitted)).

Nevertheless, "[d]eference does not mean acquiescence."  *Presley v. Etowah Cty.*

*Comm'n*, 502 U.S. 491, 508 (1992).  The D.C. Circuit has not hesitated to reject agency

determinations under APA's substantial evidence standard when an agency ignores factual

matters or fails to respond adequately to meritorious arguments raised in opposition to the

agency's action.  *See, e.g.*, *Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1136–38

(D.C. Cir. 2013) (rejecting agency rule under APA substantial evidence standard where group

challenging rule presented credible evidence contrary to agency findings and agency offered only

"mere assertion" that rule accounted for contrary evidence in reply); *Butte Cty.*, 613 F.3d at 194

(rejecting agency finding under APA substantial evidence standard where agency failed to

"articulate a satisfactory explanation" and agency "ignore[d] evidence contradicting its position"

(internal quotation marks and citations omitted)); *Dillmon*, 588 F.3d at 1091 (rejecting agency

36

decision as unsupported by substantial evidence where agency failed to offer "compelling reason for refusing to believe [the plaintiff]" and overturning previous factfinder's credibility determination); *Safe Extensions, Inc.*, 509 F.3d at 605 (rejecting agency decision where "the FAA has provided absolutely no evidence to back it up" since "[a]s we have said many times before, '[a]n agency's unsupported assertion does not amount to substantial evidence.'" (*quoting Algonquin Gas Transmission Co. v. FERC*, 948 F.2d 1305, 1313 (D.C. Cir. 1991))).

Set against this APA standard for review of an agency's factual findings, the Court examines the record support for the NPFC's conclusion in the First Denial Decision that Captain Bucklin was grossly negligent—not merely negligent, as the plaintiff agrees—in navigating the MONARCH on January 15, 2009.  As summarized *supra* in Part I.D.1, the gross negligence conclusion is predicated on two key factual findings: (1) "Captain Bucklin's failure to determine the position of his vessel with regard to distance and approach to the platform when he relieved the watch"; and (2) "[Captain Bucklin's] inattention to the circumstances of the vessel in the last minutes before the allision, as indicated by the phone calls to another platform."  AR US003494 (First Denial Decision).  These findings, the NPFC concluded, "constitute gross negligence, an extreme departure from the degree of care required under the circumstances or a failure to exercise even slight care."  *Id.* [16]

---

[16]     Both the First and Second Denial Decisions describe the "extreme conditions that presented a greater risk" to the MONARCH, noting that "[b]ecause of the increased risk a greater degree of care was required."  AR US003493 (First Denial Decision); *see also* AR US003545 (Second Denial Decision, stating "[a] greater degree of care is required when the circumstances present a greater apparent risk" and "[i]n this case the circumstances presented a greater risk because the weather was extreme.").  This parroting of the negligence and gross negligence standard is unhelpful for two reasons: First, the record evidence indicates that the environmental conditions on January 15, 2009 were such typical conditions in which the MONARCH routinely operated during the winter, even if "extreme," that the USCG had issued guidelines for such operations.  *See* AR US003774 (USCG Report stating "[c]urrently several types of vessels must follow ice guidelines when transiting through Cook Inlet to mitigate some of the extreme hazards of operating in Cook Inlet, however, the MONARCH is currently not subject to these guidelines.").  Second, describing the extreme environmental conditions does not explain how Captain Bucklin failed, on a *gross* level, to exercise care in his navigation of the MONARCH when the undisputed fact is that he appropriately navigated the vessel in these extreme conditions through thick pancake ice, showing the great care required to do so safely.  To put it another way, the NPFC does not explain what Captain Bucklin *should have done*

The decision, however, ignores critical context provided in the USCG investigative record and amounts to cherry-picking of evidence that, when considered as a whole, raises significant doubt about the ultimate conclusion reached.  *See* Pl.'s Mem. at 22 ("The problem with these so-called factual determinations is there is <u>no</u> evidence to support them, let alone any citation to the record by the NPFC.") (emphasis in original)).  While the NPFC may be correct that it "is not bound by [USCG] reports of investigation, and can find additional or even different facts and reach different opinions or conclusions," AR US003495, the agency's conclusion must nonetheless be supported by the record as a whole.  The NPFC is not free to ignore, without explanation, the record evidence and factual findings highlighted by USCG investigators, who have close familiarity with the environmental and operating conditions and the actual events under review, particularly since, as the plaintiff points out that, it is "likely fair to say that no one handling the claim at the NPFC office in Washington, D.C. has any experience at all in handling a vessel in ice conditions in Alaska."  Pl.'s Mem. at 19.

Contrary to the first key finding, evidence in the record shows that, although Captain Bucklin was initially informed by Chief Mate Hebb when Captain Bucklin arrived early for his watch that the MONARCH was forty-five minutes away from the Granite Point platform, the Captain rapidly reassessed the vessel's positioning and realized that the MONARCH was only approximately ten minutes away from the platform.  AR US002486 (USCG Captain Interview).  The First Denial Decision acknowledges that Captain Bucklin "intended to maneuver the vessel at an *appropriate* time and distance from the platform so as to come about into the vectors in play, primarily the current but also the wind and ice conditions, and make a controlled approach

---

that would have satisfied his alleged heightened duty of care under the circumstances.  At most, the First Denial Decision can be read to suggest that Captain Bucklin should not have placed the two telephone calls "in the midst" of final maneuvers to the platform, even though the record shows that the Captain did not, in fact, place the calls in the midst of such maneuvers but *before* he began the approach to the platform.

to the platform to the south and east," AR US003492 (emphasis added), making clear that when he assumed the watch, the Captain made an "appropriate" plan for approaching the platform. The Decision neither cites nor refers to any evidence in the record showing that Captain Bucklin failed to determine the actual position of the vessel when he first assumed his watch, making this first finding flatly unsupported.

The NPFC's second critical factual finding is that Captain Bucklin's calls to the Anna Platform at 5:44 a.m. and 5:45 a.m. occurred "in the midst of [his] last minute maneuvers" and "[a]t a time when his situational awareness should have been focused on his location, speed and ensuring a proper approach to the platform." AR US003494. In the NPFC's view, this amounted to "an extreme departure from the degree of care required under the circumstances or the absence of even slight care." *Id*. Yet, the record indicates that, rather than occurring during "last minute maneuvers," these two calls were placed prior to such maneuvers and before Captain Bucklin realized how close he was to the Granite Point Platform. In other words, these two calls were placed during a period when Captain Bucklin had lost situational awareness due to navigating the vessel through ice leads and heavy ice coverage. The NPFC gives scant attention to the substantial evidence in the record that by following appropriate protocol in maneuvering the MONARCH into ice leads of open water or thinner ice, *see* AR US003793 (USCG Report describing Captain's method of navigating the ice as "correct"), Captain Bucklin lost situational awareness as he approached the platform in environmental conditions that resulted in him being unable to modify or "call[] off the approach," *id*.

The NPFC's heavy reliance on the two placed telephone calls for its finding of gross negligence suggests that, in the agency's view, had Captain Bucklin not made these unanswered calls, he would have "pa[id] sufficient attention to the circumstances of the vessel at a critical

junction" and been able to avoid the allision. AR US003494.  Given the record evidence of the

Captain's lack of situational awareness at that time, this view is only "speculation [which] is an

inadequate replacement for the agency's duty to undertake an examination of the relevant data

and reasoned analysis," *Horsehead Resource Dev. Co. v. Browner*, 16 F.3d 1246, 1269 (D.C.

Cir. 1994), and which also ignores other contextual evidence in the record.  Specifically, even if

these two calls had not been placed, the record shows that the MONARCH was moving through

a heavy flood current and "slushy gooey broken ice" conditions, and, as a result, the vessel gave

only "minimal response" to the Captain's efforts to maneuver it.  AR US002488 (USCG Captain

Interview).  The ice leads followed by the vessel curved in a manner that incorrectly positioned

the MONARCH "perpendicular to the south side of the platform and cross-wise to the current."

AR US002640 (GDS Report).  Thus, the NPFC's conclusion that Captain Bucklin could have

avoided the allision had he not placed the two telephone calls has scant record support and

appears based on a purely "unsupported assumption[]," on which an agency is not entitled to

rely.  *Nat'l Gypsum Co. v. U.S. E.P.A.*, 968 F.2d 40, 43 (D.C. Cir. 1992) (an agency is not

permitted to "infer" facts not in the record); *see also Nat. Res. Def. Council, Inc. v. EPA*, 859

F.2d 156, 210 (D.C. Cir. 1988) (agency actions based on "mere speculation" are arbitrary and

capricious).

In sum, the two key factual findings underlying the NPFC's First Denial Decision are

alternately incorrect or speculative, while leaving a significant gap by not addressing the

Captain's lack of situational awareness arising from "correct[ly]" navigating the vessel through

the ice.  In such circumstances the deference owed under the APA to the factual findings of an

administrative agency are fundamentally undermined.  *See Safe Extensions, Inc.,* 509 F.3d at 605

(noting that an agency's factual finding "unsupported by any evidence is insufficient to make the

agency's decision non-arbitrary"); *Haselwander v. McHugh*, 774 F.3d 990, 1000 (D.C. Cir. 2014)

("Where, as here, an agency's explanation for its determination lacks any coherence, we owe no

deference . . ."). These problematic factual findings underlying the NPFC's conclusion of gross

negligence warrant setting aside the First Denial Decision.[17]   In addition, however, the legal

analysis applied by the agency is also sufficiently flawed to require remand, as discussed next.

### C.   THE NPFC'S LEGAL REASONING IS INADEQUATE

In addition to challenging the NPFC's factual findings as "baseless," Pl.'s Reply at 19,

the plaintiff argues that the NPFC's denial of the limitation of liability must be rejected under the

APA because it "relies upon a misapplication" of "its own definition of 'gross negligence,'" Pl.'s

Reply at 3, that "is inconsistent even with its own reported precedent," *id*. at 6.  The Court agrees

that the NPFC's First Denial Decision is legally flawed for that reason as well as another reason.

---

[17]    Even if the Second Denial Decision were the final agency action subject to review, the same conclusion would be reached.  While, as indicated *supra* in Part I.D.2, the NPFC's reasoning shifted on reconsideration, the agency arrived at the same conclusion of gross negligence by Captain Bucklin.  The NPFC cited as reasons for this conclusion, first, as in the First Denial Decision, that Captain Bucklin placed the two unanswered telephone calls and, second, that he failed to maintain a safe speed on the approach to the platform. AR US003545 (Second Denial Decision). With respect to the calls, the NPFC provides additional detail in the Second Denial Decision that "[i]f the Captain had been focused on his approach at 0544 instead of making the first phone call," this could have "perhaps avoid[ed] an allision with the platform." *Id*. at AR US003544-45.  Despite strong evidence that Captain Bucklin lost situational awareness due to his focus on navigating through the heavy ice throughout his watch, AR US003526–27 (Wright Decl.), the NPFC pinpoints the "lost awareness" to "two minutes prior to the allision *because* he was distracted by the two phone calls he made to Anna Platform."  AR US003545 (Second Denial Decision) (emphasis added).  As in the First Denial Decision, the agency's conclusion that Captain Bucklin "lost awareness" of the vessel's distance to the platform due to the two calls simply ignores the ample record evidence that his loss of situational awareness was instead due to the navigation conditions.  In any event, according to Captain Bucklin, he did "not make any phone calls in the midst of any last minute maneuvers," but rather, placed these calls "as much as 45–50 seconds before [he] even began to shape up for the approach to the Granite Point Platform."  AR US003521–22 (Decl. of Captain Bucklin ¶ 4).  Captain Bucklin explained that he "was not on the phone when [he] began to make the approach and realized that the MONARCH was out of alignment." *Id*. at US003522.  The NPFC's speculation that it was the *telephone calls* that caused the allision is simply not "supported by substantial evidence." *See Dickinson*, 527 U.S. at 164. With respect to the NPFC's second finding in the Second Denial Decision, faulting Captain Bucklin for failing to maintain a "safe speed" on the approach to the Granite Point platform, AR US003545, this finding again ignores other contextual information.  The Captain admits that he increased the vessel's speed when he saw open water to get out of the ice packs, but he did so as part of his attempt to *avoid* the allision, after he became aware of how close the platform and his incorrect approach was to the platform. AR at US004053 (USCG Captain Interview); AR US003621-22 (Decl. of Captain Bucklin). The vessel did not respond to his steering, however, due to the environmental conditions. AR US004053 (USCG Captain Interview).

First, the NPFC's definition of "gross negligence" is overly broad, particularly as applied here, capturing conduct that may amount to no more than simple negligence. Second, even if the NPFC's definition were allowed to stand, application of that definition in this case departs markedly from prior agency precedent, where the agency has declined to find gross negligence in circumstances involving more egregious conduct than that of Captain Bucklin's handling of the MONARCH on January 15, 2009. *See LePage's 2000, Inc. v. Postal Regulatory Comm'n*, 642 F.3d 225, 233 (D.C. Cir. 2011) ("[W]e, of course, cannot uphold a decision where an agency departs from established precedent without a reasoned explanation."). Either or both of these reasons requires that the First Denial Decision be set aside due to the insufficiency of its legal analysis.

### 1.     The NPFC's Definition of "Gross Negligence"

The OPA provides an exception for the limitation on liability "if the incident was proximately caused by-- (A) gross negligence . . . ." 33 U.S.C. § 2704(c)(1)(A). No definition for "gross negligence" is set out in the statute and the NPFC has engaged in no formal notice and comment rulemaking, or any informal rulemaking, to define this statutory term for purposes of denying the limitation on liability and access by responsible parties to reimbursement for oil discharge removal costs from the Oil Spill Liability Fund. Instead, the NPFC has adopted and applied here a definition of this statutory language that originated in an administrative decision made by an NPFC claims manager in *Kuroshima. See* AR US003493 (First Denial Decision). Determining the meaning of an ambiguous statutory term "is ordinarily the province of the courts, and the exception to this rule—deference—is not something to which an agency is entitled simply by virtue of its being an agency that has expressed an interpretation in the proper form." *AKM LLC dba Volks Constructors v. Sec'y of Labor*, 675 F.3d 752, 765 (D.C. Cir. 2012)

(Brown, J., concurring).  Rather, "[d]eference in accordance with *Chevron* . . . is warranted only 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'"  *Fox v. Clinton*, 684 F.3d 67, 76 (D.C. Cir. 2012) (quoting *Gonzales v. Oregon*, 546 U.S. 243. 255-56 (2006)).

Here, the OPA granted no express authority to the USCG or its component, the NPFC, to formulate a definition of the statutory term "gross negligence."  *See generally* 33 U.S.C. § 2701-4.  Moreover, the definition of gross negligence in the *Kuroshima* decision "lack[s] the administrative formality or other attributes that would justify substantial judicial deference under Chevron . . . and hence . . . would at best qualify for the more limited form of deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, [139-140] (1944)."  *Power v. Barnhart*, 292 F.3d 781, 786 (D.C. Cir. 2002).  This form of deference, however, "is entitled to respect only to the extent it has the 'power to persuade.'"  *Fox,* 684 F.3d at 76 (quoting *Skidmore*, 323 U.S. at 140).  "The "weight accorded to an administrative judgment 'will depend upon the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements.'"  *United States v. Mead*, 533 U.S. 218, 219 (2001) (quoting *Skidmore*, 323 U.S. at 140).  The *Kuroshima* decision provides the definition of "gross negligence" prefaced with the statement that the "NPFC has defined gross negligence as follows," with no citation to any other administrative decisions or regulations.  *Kuroshima,* 2003 A.M.C. at 1693.  No further explanation for adoption of this definition is provided, let alone any analysis of the OPA's statutory text, its legislative history, case law, or even prior NPFC precedent.  This dearth of justification or explanation for the definition of "gross negligence" in the administrative decision

falls far short of persuading the Court that this definition appropriately reflects the meaning of this statutory term or is entitled to any deference under the APA.

The starting point in discerning the meaning of "gross negligence" as used in the OPA is to examine the existing statutory text, reading the words in context "and with a view to their place in the overall statutory scheme.'" *Util. Air Regulatory Grp. v. E.P.A.*, 134 S. Ct. 2427, 2441 (2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133 (2000)); *see also Robinson v. Shell Oil Co.,* 519 U.S. 337, 341 (1997) (interpreting statutory language requires examination of "the specific context in which . . . language is used" and "the broader context of the statute as a whole").  When faced with an undefined term such as "gross negligence," which is a "nebulous one," *Farmer v. Brennan*, 511 U.S. 825, 836 n.4 (1994), "a court [must] look to the intent of Congress as revealed in the history and purposes of the statutory scheme,"  *Penn Allegh Coal Co. v. Holland,* 183 F.3d 860, 864 (D.C. Cir. 1999) (internal quotation marks omitted); *see also Nat. Res. Def. Council, Inc. v. Browner*, 57 F.3d 1122, 1127 (D.C. Cir. 1995) ("Reference to statutory design and pertinent legislative history may often shed new light on congressional intent, notwithstanding statutory language that appears 'superficially clear.'").[18] A statutory "provision that may seem ambiguous in isolation is often

---

[18]     Courts have expressed inconsistent views regarding the meaning of "gross negligence," thereby illustrating the ambiguity of this term and the necessity of analyzing its meaning within the context of the OPA.  *See Fidelity Leasing Corp. v. Dun & Bradstreet, Inc.*, 494 F. Supp. 786 (E.D. Pa. 1980) (noting that term "gross negligence" has no "universally accepted" definition).  The "most relaxed definition of gross negligence" courts have provided is negligent conduct that amounts to a "want of even slight care and diligence."  *Houston Expl. Co. v. Halliburton Energy Servs., Inc.*, 269 F.3d 528, 532 (5th Cir. 2001); *see also Holland v. Florida*, 560 U.S. 631, 658 (2010) (Alito, J., concurring in part and concurring in the judgment)(noting that "gross negligence" may describe "ordinary negligence with a vituperative epithet added"); *Saba v. Compagnie Nationale Air Fr.*, 78 F.3d 664, 667-669 (D.C. Cir. 1996) (describing "a continuum that runs from simple negligence through gross negligence to intentional misconduct.  Recklessness, or reckless disregard, lies between gross negligence and intentional harm" in interpreting terms "willful misconduct" and "reckless disregard" as used in the Warsaw Convention).  A district court recently construed the meaning of "gross negligence" as used in the OPA, acknowledging it to be "a nebulous term that is defined in a multitude of ways, depending on the legal context and the jurisdiction," *In re Oil Spill*, 21 F. Supp. 3d 657, 772 (E.D. La. 2014), and interpreting the term as "less blameworthy than recklessness," *id.* at 774.

clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *United Sav. Assn. of Tex. v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 371 (1988).  After all, "[c]ourts have a duty to construe statutes, not isolated provisions." *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 290 (2010) (internal quotation marks omitted).

The OPA is one of a series of statutes regulating natural resource damages resulting from oil spills or other discharges of hazardous chemicals.  These statutory schemes typically cap and limit liability, unless the responsible party has engaged in "willful" or "gross" negligence, or "willful misconduct." *See, e.g.*, Clean Water Restoration Act of 1966, Pub. L. No. 89-753, § 211(a), 2(3), 80 Stat. 1246, 1252-53 (defining "discharge" as "any grossly negligent, or willful spilling, leaking, pumping, pouring, emitting, or emptying of oil"); Water Quality Improvement Act of 1970 ("WQIA"), Pub. L. No. 91-224, § 11(f)(1), 84 Stat. 91, 94 (limiting liability but authorizing unlimited liability "where the United States can show that such discharge was the

---

Other courts, however, have stressed that, especially in the admiralty law context, gross negligence is essentially equivalent to "recklessness," or that it requires "some extreme departure from reasonable care coupled with a conscious awareness of the risk of harm." *Lobegeiger v. Celebrity Cruises, Inc.*, No. 11-21620-CIV, 2011 WL 3703329, at *16 (S.D. Fla. Aug. 23, 2011); *see also Farmer v. Brennan*, 511 U.S. at 836 (describing "gross negligence" as "in practice typically meaning little different from recklessness as generally understood in the civil law"); *Houston Expl. Co.*, 269 F.3d at 532 (concluding that district court "clearly erred" in finding gross negligence in a case of a blowout of a natural gas well in the Gulf of Mexico when no evidence showed that the responsible party "knew or should have known that a blowout might occur" if a particular valve was "not properly pinned"); *Sundance Cruises Corp. v. Am. Bureau of Shipping*, 799 F. Supp. 363, 380 (S.D.N.Y. 1992), *aff'd*, 7 F.3d 1077 (2d Cir. 1993) (defining gross negligence as conduct "so extremely careless that it was equivalent to recklessness"); W. Page Keeton, *et al.*, Prosser and Keeton on the Law of Torts § 34, at 211–12 (5th ed. 1984) (noting that "it is still true that most courts consider that 'gross negligence' falls short of a reckless disregard of the consequences, and differs from ordinary negligence only in degree, and not in kind," and that "[a]s it originally appeared," gross negligence "was very great negligence, or the want of even slight or scant care" but that "[s]everal courts, . . . dissatisfied with a term so nebulous . . . have construed gross negligence as requiring willful, wanton, or reckless misconduct");  Restatement (Second) of Torts § 282, Special Note 5 (1965) ("[i]n the construction of statutes which specifically refer to gross negligence, that phrase is sometimes construed as equivalent to reckless disregard").

result of willful negligence or willful misconduct within the privity and knowledge of the owner"); Federal Water Pollution Control Act of 1972 ("FWPCA" or "Clean Water Act"), Pub. L. No. 92-500, 86 Stat. 816 (superseding the WQIA and limiting liability clean-up costs, except where the United States can show that the discharge was the result of "willful negligence or willful misconduct," which is the same language used in the WQIA); Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), Pub. L. No. 96-510, 94 Stat. 2767, § 107(c)(2) (providing for limited liability for removal of hazardous substances, unless "the release or threat of release of a hazardous substance was the result of willful misconduct or willful negligence").  The OPA was enacted after this series of laws and included an amendment to the FWPCA that changed the FWPCA's language describing the exception for the limitation on liability from "*willful* negligence or willful misconduct" to "*gross* negligence or willful misconduct."  *See* Oil Pollution Act of 1990, 101–380, § 4301(b)(D), 104 Stat. 484, 537 (emphasis added).

None of these statutes defines "willful" or "gross" negligence, except for a single section of CERCLA that limits liability for State and local governments when they render assistance in addressing hazardous incidents, but removes the liability limitation when those governments engage in "gross negligence."  *See* 42 U.S.C. § 9607(d)(1).  This provision states that "[f]or the purpose of the preceding sentence, reckless, willful, or wanton misconduct shall constitute gross negligence."  *Id.* at § 9607(d)(2).  Thus, Congress has defined the term "gross negligence" in a parallel statute to the OPA to require "misconduct" that is "reckless, willful, or wanton."  *See AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 454 (2d Cir. 2009) (noting that CERCLA's definition of "gross negligence" in section 9607(d)(2) "comports with the common

law definition of gross negligence as conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing" (internal quotations and citations omitted)).

"There is a presumption that Congress uses the same term consistently in different statutes." *Nat'l Treasury Employees Union*, 452 F.3d at 857–58; *see also Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 254 (1994).  Moreover, "[p]arallel provisions give 'a strong indication' that the common term should be construed consistently under each statute." *Nat'l Treasury Employees Union*, 452 F.3d at 858 (quoting *Indep. Fed'n of Flight Attendants v. Zipes,* 491 U.S. 754, 758 n.2 (1989)); *see also Kooritzky v. Herman,* 178 F.3d 1315 (D.C. Cir. 1999) (explaining that similar language in different statutes is a strong indication that the language should be interpreted alike).  Indeed, "when Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." *Smith v. City of Jackson, Miss.,* 544 U.S. 228, 233 (2005); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85–86 (2006) ("[W]hen 'judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its . . . judicial interpretations as well.'" (quoting *Bragdon v. Abbott,* 524 U.S. 624, 645 (1998)); 82 C.J.S. *Statutes* § 476 (2014) (statutes relating to the same subject matter "generally should be read as together constituting one law and should be harmonized if possible").

Case law interpreting OPA's term "gross negligence" and related statutes is sparse. Nevertheless, CERCLA's statutory definition of "gross negligence," combined with case law interpreting "willful negligence," as used in the OPA's predecessor statute, the FWPCA, indicate that the terms require conduct that is "willful," "wanton" or amounts to a reckless disregard of

the consequences of a particular act or omission.  For example, the Fourth Circuit, interpreting

the FWPCA, has reasoned that "[a]lthough the term 'willful negligence' has been called a self-

contradiction, it has a recognized meaning."  *Steuart Transp. Co. v. Allied Towing Corp.*, 596

F.2d 609, 614 (4th Cir. 1979).  "The term refers to reckless disregard for the probable

consequences of a voluntary act or omission."  *Id.*; *see also* Thomas J. Schoenbaum, 1 Admiralty

& Maritime Law § 18-3 n.19 (5th ed. 2015) (noting that "[g]uidance to the standard for breaking

the limitations under OPA may be gained from prior case law under the FWPCA" which "show

that the standard of willful misconduct or gross negligence requires more than mere negligence

but reckless disregard for the probable consequences of a voluntary act or omission").[19]

Viewing the OPA within the context of its parallel and predecessor statutes with similar

purposes evinces Congress's intent to provide for limited liability, unless the responsible party

engaged in egregious "misconduct" that was wanton, willful or reckless.  This definition brings

the OPA's standard of "gross negligence" in line with its sister and predecessor statutes, ensuring

maintenance of Congress's careful balance between encouraging parties to engage in public

welfare enhancing, but nonetheless inherently risky, conduct—*i.e.*, oil exploration, production,

and transportation—while discouraging conduct amounting to wanton or reckless disregard of

the risks involved.

By contrast, the NPFC's administratively sanctioned definition of "gross negligence,"

which occurs "when there is an extreme departure from the care required under the

---

[19]     The district court in *In Re Oil Spill* viewed "[t]he fact that OPA replaced 'willful negligence' with 'gross negligence' [as] suggest[ing] that Congress intended a different and lower standard to apply—particularly when considered with the fact that one purpose of OPA was to increase the deterrent effect civil penalties would have on oil spills."  21 F. Supp. 3d at 736.  Despite the logic in that reasoning, an alternative reason for the OPA change to "gross negligence" is just as likely: rather than lowering the standard for denying the limitation on liability to make oil discharge removals more costly for responsible parties, Congress simply used the same language during enactment of the OPA in 1990 that had recently been used in 42 U.S.C. § 9607(d)(2), as part of a 1986 amendment to CERCLA, which also supplied a definition for the exact term.

circumstances or a failure to exercise even slight care," AR US003493 (First Denial Decision),

fails to capture the notion of deliberateness and conscious disregard of apparent risks suggested

by "misconduct" that is "reckless, willful, or wanton."  Courts and commentators have

formulated definitions of gross negligence that better reflect this notion.  *See, e.g., United States

v. Raymonda*, 780 F.3d 105 (2d Cir. 2015) (noting that gross negligence is "often equated" with

recklessness and "defined it as the kind of conduct . . . where [the] defendant has reason to know

of facts creating a high degree of risk of physical harm to another and deliberately acts or fails to

act in conscious disregard or indifference to that risk." (quoting *Poe v. Leonard*, 282 F.3d 123,

140 n.14 (2d Cir. 2002) (alterations in original)); *AMW Materials Testing, Inc. v. Town of

Babylon*, 584 F.3d 436, 453-455 (2d Cir. 2009) (noting that CERCLA's definition of gross

negligence "comports with the common law definition of gross negligence as 'conduct that

evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing.'"

(quoting *Curley v. AMR Co*rp., 153 F.3d 5, 13 (2d Cir. 1998)).

The NPFC fails to explain how the definition of "gross negligence" adopted and applied

in the First Denial Decision is the appropriate standard under the OPA, particularly in the face of

a statutory definition for this term in a sister statute that is more stringent in its requirement of

wrongdoing.  This gap in legal analysis renders the foundation for the legal conclusion that

Captain Bucklin engaged in gross negligence shaky at best since the conduct at issue may not

amount to the level of wanton, willful, or reckless misconduct that Congress intended would

preclude limited liability.  This flaw in the First Denial Decision only compounds the problem

that the two factual findings underlying the conclusion of gross negligence—namely, that

Captain Bucklin failed to determine the MONARCH's position when he assumed the watch and

placed two calls "to another platform in the midst of the last minute maneuvers," AR

US003494—lack substantial record support.

### 2.      Inconsistency of Gross Negligence Finding with Prior Administrative Decisions

Even assuming the definition of gross negligence used in the First Denial Decision

expressed the correct standard under the OPA and, further, that the factual findings made by the

NPFC were supported by the record, the NPFC's decision would still be puzzling in view of the

agency's prior decisions.[20]  Examination of these prior decisions shows that the NPFC has found

only simple negligence in cases involving far more egregious conduct at issue than in this case.

The D.C. Circuit has explained that an agency is "not required 'to grapple with every last

one of its precedents, no matter how distinguishable,'" *United States Postal Serv. v. Postal*

*Regulatory Comm'n*, No. 15-1338, 2016 WL 7094019, at *2 (D.C. Cir. Dec. 6, 2016) (quoting

*Jicarilla Apache Nation v. Dep't of the Interior*, 613 F.3d 1112, 1120 (D.C. Cir. 2010)), but "[a]t

the same time, we have never approved an agency's decision to completely ignore relevant

precedent." *Jicarilla*, 613 F.3d at 1120.  "[A]n agency's failure to come to grips with conflicting

precedent constitutes an inexcusable departure from the essential requirement of reasoned

decision making." *Id*.  Thus, "[w]hen an agency departs from its prior precedent without

explanation, . . . . its judgment cannot be upheld." *Manin v. Nat'l Tranp. Safety Bd.*, 627 F.3d

1239, 1243 (D.C. Cir. 2011); *see also LePage*, 642 F.3d 225 at 233 ("[W]e, of course, cannot

---

[20]      The government argues that administrative decisions not included in the instant AR should be ignored, but the cases relied upon for this position are both non-binding and wholly inapposite.  *See* Def.'s Reply at 7 & n.3 (citing *Safari Club Int'l v. Jewell*, 111 F. Supp.3d 1, 3-4 (D.D.C. 2015); *Maritel, Inc. v. Collins*, 422 F. Supp.2d 188, 196 (D.D.C. 2006); *Smith Prop. Holdings, 4411 Connecticut LLC, v. United States*, 311 F. Supp.2d 69, 79 (D.D.C. 2004); *Wild Earth Guardians v. Salazar*, 670 F. Supp.2d 1, 6 (D.D.C. 2009); *Tindal v. McHugh*, 945 F. Supp.2d 111, 124 (D.D.C. 2013)).  These cases stand for the simple proposition that, in assessing the sufficiency of the agency's reasoning, judicial review is generally limited to the factual record before the agency, but no such limitation is imposed on the legal authorities that may be probative in this review.

uphold a decision where an agency departs from established precedent without a reasoned explanation." (internal quotation marks omitted)).

In this case, the plaintiff highlights several NPFC decisions that raise troubling concern about inconsistent application of the administratively-used gross negligence standard. Pl.'s Reply at 7–9. For example, in TUG REBEL, the second mate failed to report a missing platform to the Coast Guard, then assumed the platform had been removed, altered the master's voyage plan, and intentionally steered the vessel in the direction of this missing platform, causing the barge to be punctured. Despite the second mate's series of negligent acts, which "lack[ed] the degree of care, caution and prudence required under the circumstances," the NPFC granted the limitation on liability claim, concluding that the conduct "d[id] not amount to 'gross negligence' or 'willful misconduct'" and only constituted simple negligence. TUG REBEL, Claim No. N06008-001, at 10 (NPFC Feb. 12, 2009) (*available at* https://www.uscg.mil/npfc/claims/2009/N06008-002%20LL%20Paid_redacted.pdf).

Similarly, the NPFC granted the limited liability claim in NEW HORIZON after finding that the master negligently overloaded the vessel with fish, when no fuel was in the stability tanks, and no stability analysis had been conducted after an overhaul of vessel, but, even so, these negligent actions did not amount to gross negligence, without evidence that the master "knew that an oil spill would occur or that he conducted the loading operations with a reckless disregard of the probability that an oil spill would occur." NEW HORIZON, Claim No. 906042-001, at 9 (NPFC July 27, 2009) (*available at* https://www.uscg.mil/npfc/claims/2009/906042-001%20Not%20Signed%20Determination%20LL%20Paid_Redacted.pdf). NEW HORIZON is particularly instructive because the NPFC declined to find gross negligence absent evidence that the master "knew that an oil spill would occur" as a consequence of his actions or evidence of a

"reckless disregard of the probability that an oil spill would occur." *Id.* Notably, in NEW HORIZON, the NPFC focused on whether the master had knowledge or reckless disregard of the high risk that injury would result, a focus that comports with the CERCLA definition of "gross negligence" requiring misconduct that is reckless, wanton or willful.

In *Kuroshima* itself, an experienced captain, aware of incoming severe weather, made "a poor decision" to weigh anchor and then remain at anchor during the severe storm, while attempting to reposition the anchor in light ballast conditions, resulting in the loss of control of the vessel, which became grounded and resulted in a 39,000 gallon oil spill. *Kuroshima*, 2003 AMC at 1681. The master was also attending to a medical emergency prior to losing control of the ship, and the NPFC found that "the master should always have stayed focused on his ship" as other crew members could have tended to the medical emergency. *Id.* at 1696. Further, the NPFC found that the captain "should have known . . . the wind and waves would have a significant impact on the maneuverability of the ship," but nevertheless found no gross negligence or willful conduct. *Id.* at 1695.

The government strains to distinguish these cases because "[n]one of the incidents" involved the specific facts at issue here, including "well known, annual, very hazardous environmental conditions" in the Gulf of Alaska, "navigating at speed, in an 'extreme tidal current,' in heavy ice," "an allision with a lighted platform towering 86 feet above the sea-surface," or "posed such an imminent and deadly threat to the crew." *See* Def.'s Reply at 11. Every case, including the instant one, presents some unique confluence of facts, but that begs the question of whether those differences are sufficiently material to dictate a different outcome. The government's recitation of the circumstances of the MONARCH allision do not present sufficiently meaningful differences with the facts at issue in prior administrative decisions to

warrant a finding of simple negligence in prior cases but a finding of gross negligence in the case of the MONARCH.

For example, the government notes the hazardous environmental conditions in the instant case, but *Kuroshima* involved a series of negligent actions taken while the ship was in a severe storm, with high winds "at Force 8 (34-40 knots)" and swells up to "10 meters (33 feet)" in Dutch Harbor, Alaska.  *Kuroshima*, 2003 A.M.C. at 1682.  While freezing temperatures and ice packs may not have figured in *Kuroshima*, both that case and the instant one involved well-known extreme environmental conditions in Alaska waters, and therefore the case is more analogous than the government allows.  Further, while the NPFC notes that the allision at issue here was with an 86-foot platform, the TUG REBEL incident also involved an allision with a charted platform that had toppled in a hurricane, where the mate intentionally steered the vessel toward the missing platform despite the charted wreck.  *See* Claim No. N06008-001, at 3.  Finally, the government suggests that this case posed "an imminent and deadly threat to the crew," without explaining how other cases where vessels capsized or resulted in actual deaths, but were not determined to be the result of gross negligence, did not pose the same threat to those aboard.  *See, e.g.*, F/V MILKY WAY, Claim No. 908039-001, at 7 (Mar. 2, 2012) (*available at* https://www.uscg.mil/npfc/claims/2012/908039-01%20LL%20Paid_Redacted.pdf) (concluding, in a case in which the vessel capsized and sank, that "the actions of the crew were negligent . . . however, the[] actions d[id] not rise to gross negligence nor d[id] they constitute willful misconduct"); *Kuroshim*a, 2003 A.M.C. at 1683 (noting that incident "seriously injure[d] three men, two of whom later die[d]").

Against this backdrop, the NPFC's conclusion of gross negligence, after summary dismissal of the USCG's finding of simple negligence, appears to be an anomalous application of

the administrative definition of "gross negligence" that is inconsistent with prior administrative

decisions.  The government does not "fulfill its obligation to undertake reasoned decisionmaking

by distinguishing precedent 'simply by emphasizing the importance of considerations not

previously contemplated,'" when prior decisions do "not involve 'materially different

situations.'"  *United States Postal Serv. v. Postal Regulatory Comm'n*, 2016 WL 7094019, at *2

(quoting *Envtl. Action v. FERC*, 996 F.2d 401, 411-12 (D.C. Cir. 1993)).  Although an agency is

"not strictly bound to follow the methodology approved in the prior . . . proceeding, it [i]s

obligated to articulate a principled rationale for departing from that methodology." *Williston*

*Basin Interstate Pipeline Co. v. FERC*, 165 F.3d 54, 65 (D.C. Cir. 1999).  The law is well-settled

that "reasoned decisionmaking requires treating like cases alike." *Hall v. McLaughlin*, 864 F.2d

868, 872 (D.C. Cir. 1989).  In these circumstances, the NPFC's conclusion of gross negligence

appears arbitrary and capricious and, therefore, unsustainable.

### D.    REMAND IS REQUIRED

The plaintiff requests that the NPFC be ordered "to pay the claim forthwith."  Pl.'s Mot.

at 2.  The government correctly notes, however, that "the proper remedy" is "to remand to the

agency the task of making a determination consistent with the Court's ruling" rather than to

award oil spill cleanup costs to the plaintiff.  Def.'s Opp'n at 1.  Indeed, "when a court

reviewing agency action determines that an agency made an error of law, the court's inquiry is at

an end: the case must be remanded to the agency for further action consistent with the corrected

legal standards." *PPG Industries, Inc. v. U.S.*, 52 F.3d 363, 365 (D.C. Cir. 1995); *see also Water*

*Quality Ins. Syndicate v. United States*, 522 F. Supp. at 232 (remanding case to the agency "in

light of the incompleteness of the agency's original analysis").  Accordingly, the plaintiff's

request for relief beyond remand to the agency is denied.

**IV.      CONCLUSION**

The plaintiff's motion for summary judgment is granted in part and denied in part, and the government's cross-motion for summary judgment is denied.  The NPFC's First Denial Decision denying the plaintiff's claim for a limitation on liability is set aside.  In addition, the plaintiff's request that the NPFC's Second Denial Decision and the related reconsideration materials be stricken from the administrative record as untimely, is granted.  This matter is remanded to the NPFC for consideration, a third time, of the plaintiff's claim for reimbursement, in a manner consistent with this Memorandum Opinion.

An Order consistent with this Memorandum Opinion will issue contemporaneously.


Date:  December 22, 2016


                                        _____
                                        BERYL A. HOWELL
                                        Chief Judge